INDIANAPOLIS RACQUET CLUB,
INC., Petitioner,

v.

STATE BOARD OF TAX
COMMISSIONERS,
Respondent.

Racquet Square Associates,
Ltd., Petitioner,

v.

State Board of Tax Commissioners,
Respondent.

Nos. 49T10–9607–TA–00088, 49T10–9609–TA–00119 and 49T10–9609–TA–00126.

Tax Court of Indiana.

Jan. 31, 2000.

---

Stephen E. DeVoe, B. Keith Shake, Michael R. Harping, Henderson, Dailey, Withrow & DeVoe, Indianapolis, Indiana, Attorneys for Petitioner.

Jeffrey A. Modisett, Attorney General of Indiana, Ted J. Holaday, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Respondent.

FISHER, J.

Petitioners Indianapolis Racquet Club, Inc. (IRC) and Racquet Square Associates, LTD. (RSA) (collectively Racquet Club) appeal three final determinations of the State Board of Tax Commissioners (State Board) denying Racquet Club's appeals challenging the validity of the 1989 assessments of IRC's indoor and outdoor tennis facilities and RSA's office building complex. In these original tax appeals, Racquet Club presents the following two issues for consideration:

I. Whether the subject properties were improperly classified in the Marion County Land Valuation Order, in violation of IND.CODE ANN. § 6–1.1–31–6 (West 1989) and the Indiana Assessment Manual, *see* IND. ADMIN. CODE tit. 50, r. 2.1–1–1 to –6–1 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–1–1 to –16–6 (1996)); and

II. Whether the base rate for IRC's indoor tennis facility was incorrectly determined using the GCM health club model, *see* IND. ADMIN. CODE tit. 50, r. 2.1–4–7 (1992) (codified in present form

at IND. ADMIN. CODE tit. 50, r. 2.2–11–1 (1996)), instead of the GCI light warehouse model, *see id.* (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–11–2 (1996)).

## FACTS AND PROCEDURAL HISTORY

IRC is an Indiana corporation formed in 1965 that owns indoor and outdoor tennis facilities located at 8249 Dean Road in Indianapolis (Dean Road Property). The Dean Road Property consists of sixteen indoor and eight outdoor tennis courts and associated facilities. RSA is an Indiana limited partnership that owns an office building complex located at 4141 East 82nd Street in Indianapolis. The complex, which lies adjacent to the Dean Road Property, consists of three one-story office buildings.

The issues presented arise from the 1989 assessment of three individual parcels. Racquet Club separately appealed the assessment of each parcel. The procedural history of these appeals is as follows. Parcel number 8051129 (Parcel A) is part of the Dean Road Property. It contains eight outdoor tennis courts. The Washington Township Assessor issued a Notice of Assessment to IRC regarding Parcel A on November 22, 1989. IRC filed a Form 130 petition for review with the Marion County Board of Review (BOR) on December 22, 1989. The BOR conducted a hearing on the petition on April 24, 1990. On November 30, 1990, the BOR issued a ruling adverse to IRC. Thereafter, on December 28, 1990, IRC filed a Form 131 petition for review with the State Board, which conducted a hearing on September 27, 1995. The State Board issued its final assessment determination on June 14, 1996. Thereafter, IRC filed an original tax appeal regarding Parcel A with this Court on July 29, 1996.[1]

Parcel number 8048124 (Parcel B) is also part of the Dean Road Property. It contains sixteen indoor tennis courts and associated facilities. The Washington Township Assessor issued a Notice of Assessment regarding Parcel B on November 22, 1989. IRC filed a Form 130 petition for review with the BOR on December 22, 1989. The BOR conducted a hearing on the petition on December 19, 1990. Subsequently, on February 8, 1991, the BOR issued a ruling adverse to IRC. IRC filed a Form 131 petition for review with the State Board on March 11, 1991. The State Board conducted a hearing on the petition on September 27, 1995 and issued its final determination on August 7, 1996. IRC filed an original tax appeal regarding Parcel B with this Court on September 23, 1996.[2]

Parcel number 8048125 (Parcel C) is adjacent to and directly east of Parcel A. The Washington Township Assessor issued a Notice of Assessment regarding Parcel C on November 22, 1989. RSA filed a Form 130 petition for review with the BOR on December 22, 1989. The BOR conducted a hearing on the petition on August 9, 1990. On August 31, 1990, the BOR issued a ruling sustaining the township assessor's valuations. RSA filed a Form 131 petition for review with the State Board on October 1, 1990. The State Board conducted a hearing on the petition on September 27, 1995. Thereafter, on August 16, 1996, the State Board issued its final determination. RSA filed an original tax appeal on September 30, 1996.[3]

---

1. Cause Number 49T10–9607–TA–00088 was assigned to the appeal of the assessment for Parcel A.

2. Cause number 49T10–9609–TA–00119 was assigned to the appeal of the assessment for Parcel B.

3. Cause Number 49T10–9609–TA–00126 was assigned to the appeal of the assessment for Parcel C.

The Court conducted a trial involving all three parcels on May 2, 1997.[4] On October 22, 1997, the Court heard oral argument on these cases. Additional facts will be supplied where necessary.

## ANALYSIS AND OPINION

### Standard of Review

The Court gives the final determinations of the State Board great deference when the State Board acts within the scope of its authority. *See Wetzel Enters., Inc. v. State Bd. of Tax Comm' rs,* 694 N.E.2d 1259, 1261 (Ind.Tax Ct.1998). Accordingly, the Court reverses final determinations of the State Board only when those decisions are unsupported by substantial evidence, are arbitrary or capricious, constitute an abuse of discretion, or exceed statutory authority. *See id.* Racquet Club bears the burden of demonstrating that the State Board's final determinations are invalid. *See Clark v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1230, 1233 (Ind. Tax Ct.1998).

### Discussion

Racquet Club challenges the validity of the 1989 Marion County Land Valuation Order (Order) as applied to Parcels A, B, and C. Specifically, Racquet Club contends that Parcels A, B and C were improperly included with surrounding commercial properties in the Order, in violation of IND.CODE ANN. § 6–1.1–31–6 (West 1989) and the Indiana Assessment Manual. As regards the appeal of Parcel B, Racquet Club asserts that taxing authorities applied the wrong model to 90% of the indoor tennis courts facility. The Court will separately consider each issue.

### I. Marion County Land Valuation Order

Racquet Club asserts that Parcels A, B and C were improperly classified within the Order, to the extent they were included as part of the area designated as page 22 in Section IV of the Order. This area, which the Court shall refer to as the "82nd Street Corridor,"[5] is described in the Order as "Allisonville Road W. to Keystone on 86th St. fr Dean Rd. Keystone No. to I–465 Interch fr 86th St."[6] (Resp't Ex. G.) "Primary" land for this commercial property ranged from three to four dollars per square foot; "usable undeveloped" land ranged from ninety cents to one dollar and twenty cents per square foot. (Resp't Ex. G.) Racquet Club argues that Parcels A, B and C should have been included within the area designated as page 24A in Section IV of the Order, which area is described as "Township—other."[7] (Resp't Ex. G.) Val-

---

4. IRC requested in its petition for original tax appeal for Parcel B that the appeals for Parcels A and B be consolidated with the appeal in cause number 49T10–9609–TA–00120 of another parcel owned by IRC, parcel number 4017437 (Parcel D), which parcel is located at 4901 North Shadeland Avenue in Indianapolis. Pursuant to this Court's order dated February 7, 1997, proceedings in the appeal of Parcel D were stayed pending the Court's decision in the appeal of Parcel A. Although no order consolidating the appeals of Parcels A, B and C has been issued, the Court and the parties without dispute have treated the cases as having been consolidated.

5. The parties used this designation at trial. (Trial Tr. at 70.)

6. The State Board, on page four of its post trial brief, correctly observes:

> The street curves through this area so that at the west end it is identified as 86th, but at the east end of the described area the same street is identified as 82nd. The land order clearly intended to describe this street as it runs between Allisonville Road and Keystone Avenue. It is also clear that the evidence in this case uses 82nd and 86th to refer to the same section of the street through this area.

Thus, the Court's references to the 82nd Street Corridor encompasses any part of 86th Street technically falling within the section designated as page 22 in Section IV of the Order.

7. There is some confusion as to whether the Order in fact classified the parcels within the 82nd Street Corridor area, because Parcel A merely touches 82nd Street at the tip of the parcel's northeast corner and Parcel B does not touch 82nd Street at all. (Pet'r Ex. 5.) There is no question that all parcels are designated part of the 82nd Street Corridor if one

ues for "Primary" land in this latter category ranged from one dollar and fifty cents to three dollars per square foot; values for "usable undeveloped" land ranged from forty-five to ninety cents per square foot. (Resp't Ex. G.)

■ Before addressing Racquet Club's argument, the Court first reviews some basic principles of Indiana's property tax assessment laws, policies and procedures. The Indiana Constitution provides, "The General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal." IND. CONST. art. X, § 1. *See also* IND.CODE ANN. § 6–1.1–2–2 (West 1989) ("All tangible property which is subject to assessment shall be assessed on a just valuation basis and in a uniform and equal manner."). As this Court noted in *Indianapolis Historic Partners v. State Board of Tax Commissioners* :

> This provision has long been held to require: (1) uniformity and equality in assessment, (2) uniformity and equality as to rate of taxation, and (3) a just valuation for taxation of all property. The purpose of these constitutional requirements is to distribute the burden of taxation upon principles of uniformity, equality, and justice.

■ 694 N.E.2d 1224, 1228 (Ind.Tax Ct.1998) (citations omitted). The General Assembly has charged the State Board with interpreting the state's property tax laws and seeing that all property assessments are made in the manner prescribed by law. *See* IND.CODE ANN. § 6–1.1–35–1 (West 1989) (amended 1997). INDIANA CODE ANN. § 6–1.1–31–6 (West 1989) in part provides the following mandatory guidelines for the State Board to follow in establishing rules governing the assessment of real property:

(a) With respect to the assessment of real property, the rules of the state board of tax commissioners shall provide for:

(1) the classification of land on the basis of:

(i) acreage;

(ii) lots;

(iii) size;

(iv) location;

(v) use;

(vi) productivity or earning capacity;

(vii) applicable zoning provisions;

(viii) accessibility to highways, sewers, and other public services or facilities; and

(ix) any other factor that the board determines by rule is just and proper[.]

■ In fulfilling its duties, the State Board is afforded a great deal of discretion. *See Poracky v. State Bd. of Tax Comm'rs,* 635 N.E.2d 235, 236 (Ind.Tax Ct.1994) (quotation omitted). The State Board exercises its discretion in part by promulgating land valuation orders. *See id.* Land valuation orders are administrative rules. *See Precedent v. State Bd. of Tax Comm'rs,* 659 N.E.2d 701, 704 (Ind. Tax Ct.1995). The party claiming that the land valuation order is invalid bears the burden to show the order is not in accordance with law. *See Poracky,* 635 N.E.2d at 237.

■ The procedure for promulgating land valuation orders is governed by statute. *See* IND.CODE ANN. § 6–1.1–4–13.6 (West 1989) (amended 1993 & 1997). Sec-

interprets the abbreviation "fr" preceding "Dean Rd." in the description as meaning "fronting." (Trial Tr. at 117.) However, this interpretation is inconsistent with the second use of the abbreviation in the description, i.e. "fr 86th St." The evidence indicates that the land valuation commission clearly placed the parcels within the 82nd Street Corridor area. (Trial Tr. at 69.) Moreover, the parties' arguments are essentially based upon this understanding. Therefore, the Court finds that Parcels A, B, and C were included within the 82nd Street Corridor area.

tion 6–1.1–4–13.6 establishes in each county a nine-member land valuation commission which was required to "determine the values of all classes of commercial, industrial, and residential land ... in the county using guidelines determined by the [State Board]." The State Board reviews and has authority to modify the land values submitted by the commissions. *See id.* Thus, the State Board ultimately must approve or disapprove of the land values. Township assessors are obligated to "use the values as determined by the commission and modified by the state board in making assessments." *Id.* The purpose of this section is to ensure that land values throughout Indiana are "set in conformity with the constitutional and statutory commands of uniformity and equality in assessment and tax rate." *See Poracky,* 635 N.E.2d at 237.[8]

Racquet Club must show that the land valuation commission's classification of Parcels A, B and C was improper. To support its claim, Racquet Club cites to *State Board of Tax Commissioners v. Valparaiso Golf Club, Inc.,* 164 Ind.App. 687, 330 N.E.2d 394 (Ind.Ct.App.1975), which considered an issue similar to that in the present case. In *Valparaiso Golf Club,* the Indiana Court of Appeals examined whether the State Board acted arbitrarily in fixing the valuation of a golf course solely on the basis of the land's use, as testified to by the State Board's own witness. The Court of Appeals first quoted IND.CODE ANN. 6–1–33–2 (West 1971) (codified in present form at IND.CODE ANN. § 6–1.1–31–5 (West 1989)(amended 1997)). This section provided that the legislature's intention was for all assessments to take "into consideration all of the elements referred to in this article." *Valparaiso Golf*

*Club,* 330 N.E.2d at 395. The Court of Appeals then quoted the relevant parts of IND.CODE ANN. § 6–1–33–3 (West 1971)— the predecessor to section 6–1.1–31–6, which included a virtually identical list (acreage, lots, etc.) of factors for the State Board to consider in classifying land for assessment. *See id.* at 395–96.

In affirming the trial court, with a minor correction, the Court of Appeals held that the trial court was justified in determining that the State Board had violated section 6–1–33–2 by only considering use and not taking into consideration all the elements enumerated in section 6–1–33–3. *See id.* at 396. According to the Court of Appeals, the statute did not require the State Board to use every element listed as an element; rather, it required the State Board to consider each element, "to determine whether the enumerated elements are applicable to the [assessment] situation at hand and then to consider those elements that are applicable." *Id.* Therefore, the Court of Appeals concluded that it was an "arbitrary action by the [State] Board to refuse to consider any of the other factors enumerated in IC 1971, 6–1–33–3." *Id.*

Racquet Club contends that, pursuant to the Court of Appeal's decision in *Valparaiso Golf Club,* the State Board may not base its assessment on only one or two of the factors listed in section 6–1.1–31–6. Racquet Club's reliance on *Valparaiso Golf Club* is misplaced. The Court of Appeals in that case relied upon the language in section 6–1–33–2, which required the State Board to take "into consideration all of the elements referred to in [section 6–1–33–3]," in deciding that the State Board erred in basing its assessment solely upon the use element. *Id.* at 395. Section 6–1–

---

8. The current version of section 6–1.1–4–13.6 provides in part that the "township assessor shall determine the values of all classes of commercial, industrial, and residential land ... in the township using . guidelines determined by the [State Board]." The assessor then submits the land values to the county property tax assessment board of appeals. *See* IND.CODE ANN. § 6–1.1–4–13.6 (West Supp.

1999). After giving proper notice, the board of appeals must hold a public hearing on the land values. *See id.* The board of appeals may modify the values submitted if it deems such modification "necessary to provide uniformity and equality." *Id.* Thus, unlike with the prior version of this section, the State Board currently does not review the submitted values.

33–2 has been replaced by section 6–1.1–31–5, which has no language requiring the State Board to consider all of the elements listed in section 6–1.1–31–6.[9] Thus, Racquet Club incorrectly states that *Valparaiso Golf Club* established a rule that the State Board must consider every element of section 6–1.1–31–6 in assessing real property and improvements.

▬▬▬ The Court's inquiry does not stop here. The Court must now consider whether the language of section 6–1.1–31–6 dictates a result similar to that reached by the Court of Appeals in *Valparaiso Golf Club*. The Court may only construe a statute if it is ambiguous. *See Indianapolis Historic Partners,* 694 N.E.2d at 1227. In construing a statute, this Court strives to determine and give effect to the General Assembly's intent. *See id.* Words and phrases in a statute are to be given their plain, ordinary, and usual meaning. *Riley at Jackson Remonstrance Group v. Indiana State Bd. of Tax Comm'rs,* 642 N.E.2d 562, 566 (Ind.Tax Ct.1994).

Section 6–1.1–31–6(a)(1) states that the State Board "shall provide for ... the classification of land on the basis of [factors one through nine]." The plain language of the section does not concretely require the State Board to consider each of the nine factors in classifying land, although it could be reasonably interpreted to have such meaning. It is thus ambiguous. The statutory language must be considered in light of the General Assembly's purpose of fulfilling the constitutional requirement of uniformity and equality in assessment and rate of taxation, as well as the requirement that all property receive a just valuation. *See Indianapolis Historic Partners,* 694 N.E.2d at 1228.

▬▬▬ The Court concludes that the most logical interpretation of section 6–1.1–31–6 is that the General Assembly intended for the State Board to consider all the factors listed in the section when promulgating a rule, including land orders. Thus, at a minimum, in placing a particular parcel within a specific category of a land valuation order, the State Board, in either approving or modifying the land order or in reviewing an assessment on appeal, must consider these statutory factors: acreage, lots, size, location, use, productivity or earning capacity, applicable zoning provisions, and accessibility to highways, sewers, and other public services or facilities. Of course, the ninth factor listed leaves room for the State Board to consider "any other factor that the [State Board] determines by rule is just and proper." IND.CODE ANN. § 6–1.1–31–6(a)(1)(ix) (West 1989). Similar to the Court of Appeal's conclusion in *Valparaiso Golf Club,* the Court herein observes that section 6–1.1–31–6 does not require the State Board to apply each factor; if the State Board considers a factor and determines that the factor is not applicable to the parcel being reviewed, then it cannot be expected to base its classification of the parcel on a non-applicable factor.

▬▬▬ Racquet Club asserts that Parcels A, B and C were not classified based upon the factors listed in section 6–1.1–31–6(a)(1). Kevin Fasick, the chief values deputy for the Washington Township Assessor's office at the time of the 1989 assessment, testified at trial.[10] According

---

9. Instead, section 6–1.1–31–5 states, among other things, that the rules promulgated by the State Board are the basis for determining a property's true tax value and that local assessing officials shall comply with the State Board's rules and use the forms prescribed by the State Board. Also, section 6–1.1–31–5 allows township assessors to use other factors in addition to those not prescribed by the State Board, if those factors are indicated in the assessor's records for each individual assessment.

10. The Court is precluded from considering issues and evidence not presented to the State Board. *See Whitley Prods., Inc. v. State Bd. of Tax Comm'rs,* 704 N.E.2d 1113, 1119 (Ind. Tax Ct.1998)(citing IND.CODE ANN. § 33–3–5–14 (West 1996)), *review denied,* 714 N.E.2d 174 (Ind.1999). Other than the hearing officer, only those witnesses who testified at the State Board's hearing may testify before the Tax

to Fasick, in grouping commercial properties within Washington Township, the land valuation commission looked at "distinct neighborhoods or areas where the[re] were similar characteristics, or at least boundary lines that could be identified clearly on a map, such as a major crossroad or a major commercial area." (Trial Tr. at 68.) Fasick stated that the commission, in including the parcels within the 82nd Street Corridor, did not consider the earning capacity of the Indianapolis Racquet Club. (Trial Tr. at 72.) Further, the commission did not consider that Parcel B did not abut 82nd Street. (Trial Tr. at 72.) Also, the commission failed to take into account that Parcels A and B did not have automobile access onto 82nd Street; rather, they could only be accessed via Dean Road. (Trial Tr. at 73.) The commission also did not consider zoning of the parcels, "[e]xcept to say it was commercial." (Trial Tr. at 73.)

Terry Warrum, the hearing officer assigned by the State Board to conduct the hearings of Racquet Club's appeals, testified that he considered the "potential" and not the "actual" earning capacity of the parcels; he did so by assuming the earnings capacity was "factored into the parcel of land . . . through the valuation order, in that . . . the valuation order was arrived at through the sale of comparable properties. . . ." (Trial Tr. at 99, 100.) Warrum accepted the classifications and property groupings of the Order as correct. (Trial Tr. at 108–09.) Both the commission and Warrum considered the "use" of the parcels, as far as whether the property was used in a commercial, industrial or residential manner. (Trial Tr. at 71–72, 118–19.) However, Warrum acknowledged that the type of commercial use between Parcels A, B and C and the other commercial properties with which it was grouped was "a big difference in use." [11] (Trial Tr. at 118.)

Court, and they may only testify to those facts to which they testified before the State Board. *See North Park Cinemas, Inc. v. State Bd. of Tax Comm'rs*, 689 N.E.2d 765, 767 (Ind.Tax Ct.1997) (quoting *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.*, 420 N.E.2d 1324, 1328 (Ind.Ct.App.1981)). The trial transcript does not reflect and the parties do not indicate whether Fasick testified at the State Board hearing. On direct examination, the State called Fasick as its first witness. The Racquet Club did not object. Because there was no objection to Fasick's testimony at trial, the Court assumes that the evidence provided by Fasick was presented at the administrative level. *See Barth, Inc. v. State Bd. of Tax Comm'rs*, 699 N.E.2d 800, 803 n.7 (Ind. Tax Ct.1998) (quoting *Indiana Ass'n of Seventh Day–Adventists v. State Bd. of Tax Comm'rs*, 512 N.E.2d 936, 940 (Ind.Tax Ct.1987)), *reh'g denied*.

The Court further notes that it is well settled law in Indiana that "boards and commissions speak or act officially only through the minutes and records made at duly organized meetings." *Scott v. City of Seymour*, 659 N.E.2d 585, 590 (Ind.Ct.App.1995) (citing *Brademas v. St. Joseph County Comm'rs*, 621 N.E.2d 1133, 1137 (Ind.Ct.App.1993)); *see also Carter v. Allen*, 631 N.E.2d 503, 509 n.4 (Ind.Ct.App.1994) (observing that trial court correctly excluded testimony of two members of the Crawford County Commissioners, which testimony was "inadmissible to prove

the legislative intent of the full body"). Given this legal principle, the Court has concerns as to whether Fasick, an employee of the township assessor, was a competent witness for purposes of showing the land valuation commission's intent. However, as stated *supra*, no objection was made to his testimony. The Court therefore saves for another day questions regarding the propriety and admissibility of such testimony.

11. Parcels A and B are zoned SU–3, a special use category for golf courses for which IRC has a variance to operate its tennis courts. (Trial Tr. at 27; Pet'r Ex. 11.) Parcel C is zoned C–1, a "buffer commercial district" separating residential properties from "more intense commercial or industrial areas/districts." (Pet'r Exs. 11, 29.) Racquet Club contends that Parcels A, B and C are grouped in the Order with other properties having zonings and usages of a type and density not permitted on the parcels because of their respective zoning classifications. As the State Board concedes, Racquet Club's parcels "would have to be rezoned to allow retail development such as occurred elsewhere along 82nd Street." (Resp't Post Trial Br. at 6.) Thus, it is important in the present case to consider the parcels' specific types of commercial zoning when classifying them pursuant to section 6–1.1–31–6 because of the varying degrees of economic activity permitted within the different zoning categories.

The trial testimony demonstrates that neither the commission nor the State Board considered all of the statutory factors in classifying Parcels A, B and C as part of the 82nd Street Corridor. The commission properly considered location as a general principle in classifying commercial properties within the township. However, in classifying the three parcels in question, the commission and the State Board overlooked or intentionally ignored certain factors required to be considered under section 6–1.1–31–6, such as: earning capacity of the parcels; accessibility to 82nd Street; the specific zoning of the parcels; and the location of Parcels A and B in relation to 82nd Street, as compared to other properties contained within the 82nd Street Corridor description. The Court concludes that it was error not to consider these factors in approving the Order or in reviewing the validity of the classification of Parcels A, B and C pursuant to the Order. Land orders are administrative rules, and section 6–1.1–3–1–6 mandates that the State Board in approving a land order consider the listed factors.

Because the listed factors were not considered, the issue of whether Parcels A, B and C were properly classified within the Order is remanded to the State Board. On remand, the State Board shall assess whether, upon considering all factors required by section 6–1.1–31–6, the parcels may be properly classified as part of the 82nd Street Corridor or whether another classification is more appropriate. Moreover, the State Board shall determine the appropriate base rate within the proper classification.

II. *Application of Proper Model*

IRC challenges the assessment of its indoor tennis courts facility on Parcel B. IRC contends that the State Board improperly determined its base rate for 90% of the facility by applying the rates for the General Commercial Mercantile (GCM) health club model. *See* IND. ADMIN. CODE tit. 50, r. 2.1–4–5 (1992) (general commercial and industrial cost schedules) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–11–6 (1996)). It is IRC's position that the State Board should have applied the base rate figures for the General Commercial Industrial (GCI) light warehouse model to this area. *See id.*

According to IRC, only 10% of the facility consists of construction that is consistent with the GCM health club model and therefore should have been assessed by application of that model. (Pet'r Br. at 18.) The facility in this 10% section is made up of a lobby, locker room, office and retail sales areas. In contrast, IRC argues that the construction of the remaining 90%, which is occupied by sixteen indoor tennis courts, more closely resembles the vertical and horizontal cost elements of the GCI light warehouse model. (Pet'r Br. at 18.) Consistent with that claim, IRC contends that the tennis facility should be classified as Unfinished. (Pet'r Br. at 18.)

Under Indiana's system for property tax assessment, "assessors use cost schedules to determine the base reproduction cost of a particular improvement." *Whitley Prods., Inc. v. State Bd. of Tax Comm'rs*, 704 N.E.2d 1113, 1116 (Ind.Tax Ct.1998) (citations omitted). The cost schedules promulgated by the State Board consist of "base square foot unit rates by floor for various 'use' and 'finish' types for two types of exterior walls." IND. ADMIN. CODE tit. 50, r. 2.1–4–3 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–10–6.1 (1996)). The State Board has categorized improvements into several models. *See id.* tit. 50, r. 2.1–4–7 (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–11–1 to –3 (1996)).[12] These models "help identify and define various classes of buildings." *Herb v.*

---

**12.** IND. ADMIN. CODE tit. 50, r. 2.2–10–6.1 (1996) describes a model as a "conceptual tool used to replicate reproduction cost of a given structure using typical construction materials.

The model assumes that there are certain elements of construction for a given use type."

*State Bd. of Tax Comm'rs*, 656 N.E.2d 890, 893 (Ind.Tax Ct.1995). The State Board has further divided the models, as regards commercial improvements, into one of three use-association groupings: (1) General Commercial Mercantile; (2) General Commercial Industrial; and (3) General Commercial Residential.[13] *See* IND. ADMIN. CODE tit. 50, r. 2.1–4–3 (1992). In addition, the models are subdivided into one of four descriptive classifications "denoting the extent to which interior finish is included in the base cost." *Id.* These classifications include: (1) Unfinished (UF); (2) Semi–Finished (SF); (3) Finished Open (FO); and (4) Finished Divided (FD). *See id.*

The State Board's regulations do not contain a model for indoor tennis facilities. However, IND. ADMIN. CODE tit. 50, r. 2.1–4–4 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–11–5.1 (1996)) lists the "proper schedule to be used in computing the replacement cost" of various commercial and industrial improvements that do not have their own GCM or GCI model. For "tennis barns," this regulation indicates that the GCM health club model should be applied.[14] *See id.* The GCM health club model has the following characteristics:

MODEL: GCM—HEALTH CLUB—First [15]

Foundation      12" Reinforced concrete perimeter grade walls to 2'6" high on 12" × 18" strip footings including Trench Excavation and Back-fill

Walls: [16]

Type 1:      Reinforced Concrete Block with 2 coats of masonry paint for 12' wall height

Type 2:      Face Brick with Block back-up for 12' wall height

Openings      1%—1¾" Hollow Metal Door

Mechanical and Interior Components

Type:      Finished Open, 10' Ceiling Height

Interior Finish

Walls      Taped and Painted Drywall on Metal Furring for a 10' Ceiling Height

Floors      40% Carpet, 50% Unfinished, and 10% Ceramic Tile

Ceiling      Suspended Acoustical Tile made of mineral fiber over 50% of the floor area

Partitions      Gypsum Board on Metal Studs with 10% Hollow Metal Doors with 4% density. 6" Concrete Block with Ceramic Tile 2 sides with a 2% density

---

13. The General Commercial Mercantile grouping "is used in use-types generally associated with mercantile districts." IND. ADMIN. CODE tit. 50, r. 2.1–4–3 (1992). The General Commercial Industrial grouping "includes those use-types generally associated with industrial related operations." *Id.* The General Commercial Residential (GCR) grouping "includes those use-types generally associated with commercial operated residential accommodations, which are more typical of residential type construction...." *Id.* Current regulations add a fourth grouping, General Commercial Kit (GCK), which does not include use type descriptions. *See* IND. ADMIN. CODE tit. 50, r. 2.2–10–6.1 (1996). The base rate schedules for each use-association grouping can be found at IND. ADMIN. CODE tit. 50, r. 2.1–4–5 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–11–6 (1996)).

14. The regulations do not define the term "tennis barn." However, IRC does not question whether the State Board or local assessing officials properly characterized its indoor tennis facility as a "tennis barn." Thus, the Court will not consider the issue.

15. "Basement, first floor, and upper floor prices are given for the various use-types." IND. ADMIN. CODE tit. 50, r. 2.1–4–3 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–10–6.1 (1996)).

16. IND ADMIN. CODE tit. 50, r. 2.1–4–3 (1992) provides that "Base rates for each use-type are given for two exterior wall types with the exception of parking garages, for which there are three."

Lighting    Average cost typical of Finished Open uses such as a Health Club Facility

HVAC    Package Air Conditioning

HTG. Only    Gas Fired Forced Air

IND. ADMIN. CODE tit. 50, r. 2.1–4–7 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–11–1 (1996)).

IRC contends that the GCI light warehouse model should be applied to determine the base rate for 90% of the tennis facility. INDIANA ADMIN. CODE tit. 50, r. 2.1–4–7 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–11–2 (1996)) lists the characteristics of the GCI light warehouse model. These characteristics include:

MODEL:    GCI—LIGHT    WAREHOUSE—First

Foundation:    12″ reinforced concrete perimeter grade walls to 2′6″ high on 12″ × 18″ strip footings including trench excavation and back-fill

Walls:

Type 1:    Reinforced concrete block with two coats masonry paint for a wall height of 18′

Type 2:    Common brick on concrete block backup for a wall height of 18′

Openings    1% 1¾″ hollow metal service doors

4% overhead doors

Mechanical and Interior Components

Type:    Unfinished, 18′ floor height

Interior Finish

Partitions    8″ hollow concrete block painted one side with a density of 100 S.F. floor/L.F. partition to a floor height of 18′

Lighting    200 Ampere service with panel board and feeders. Fixtures are fluorescent and include switches and receptacles.

HTG Only    Gas fired, hot water boiler with unit heaters

AC Add    Single zone electric cooling

The Court first notes that IRC was entitled to have its property assessed using the correct cost schedule. *See Zakutansky v. State Bd. of Tax Comm'rs*, 696 N.E.2d 494, 497 (Ind.Tax Ct.1998). However, a "classification for taxation purposes is not invalid when it rests on a reasonable basis of actual difference between those included and those excluded." *Herb*, 656 N.E.2d at 894. Moreover, "because a building may not conform perfectly with model specifications, a hearing officer must use subjective judgment to decide which model the building most closely resembles." *Id.* Thus, the hearing officer has some discretion in selecting which model to use.

In *Zakutansky v. State Board of Tax Commissioners*, the taxpayer owned a marina consisting of, among other things, several buildings described as "simple metal pole buildings with few distinguishing features." *Zakutansky*, 696 N.E.2d at 494. The taxpayer argued that these buildings had been assessed by application of the wrong cost schedules. Specifically, the taxpayer claimed that, because the buildings were pole barns, the State Board should have used the Residential and Farm cost schedules, *see* IND. ADMIN. CODE tit. 50, 2.1–3–5 (1992) (codified in present form at IND. ADMIN. CODE tit. 50, r. 2.2–7–11 and –9–6 (1996)), rather than the GCM cost · schedule. *See Zakutansky*, 696 N.E.2d at 497.

The State Board in *Zakutansky* asserted three arguments in support of its assessment: (1) the assessor is given discretion to select the appropriate model and cost schedule based on "class and usage"; (2) the buildings' physical features were considered in determining the appropriate cost schedules and adjustments had been made to reflect the quality of the construction; and (3) with appropriate adjustments, the pricing for the buildings would be very similar for a pole barn and a commercial building. *See id.* The Court disagreed with each of the State Board's arguments, observing that the taxpayer

had presented evidence showing the buildings to be basic metal pole buildings. *See id.* at 497 n.6.

As to the State Board's first argument, the Court observed that the taxpayer's use of the buildings was not determinative of which cost schedule to apply. *See id.* at 497. Quoting *Herb v. State Board of Tax Commissioners,* 656 N.E.2d 890, 893 (Ind. Tax Ct.1995), the Court stated: "The actual use of the property is not a determinative factor in selecting the appropriate model, but merely a starting point. As a result, the model that most closely resembles the subject improvement with respect to physical features is to be used, regardless of the model's name."[17] *Id.* Thus, the Court concluded that the correct cost schedule to apply was that for pricing pole barns. *See id.* The Court further noted:

> [T]he State Board's consideration of the quality of the building and an adjustment based on that quality are of no avail. Nor is the fact that the adjusted pricing using a commercial cost schedule would be very close to that of a pole barn. The taxpayer is entitled to have his property assessed using the correct cost schedule. Only after this is done may adjustments for quality be made. Moreover, the fact that the State Board's assessment was close to the assessment it would have arrived at using the appropriate schedule does nothing to aid its position.

*Id.*

■■■ At trial, Stephen E. DeVoe (DeVoe), former IRC President, testified that he had been involved with the design and construction of the tennis facility. (Trial Tr. at 35.) He generally described the construction of the indoor tennis courts area. DeVoe explained that steel girders on approximately twenty-four foot centers ran all the way down the two sets of eight courts on the north and south sides of the facility. (Trial Tr. at 35–36.) These provided the structural support for the building. (Trial Tr. at 35.) Each girder sits on a concrete pad. (Trial Tr. at 36.) There is no foundation. (Trial Tr. at 36.) A layer of brick block, approximately two blocks wide and three blocks deep, comes to the ground's surface, providing a stable surface to attach the building's metal sides. (Trial Tr. at 36.) Sheet metal beams are run between the girders; these beams support the sheet metal siding that is bolted to the building. (Trial Tr. at 36.) No ceiling, interior walls or partitions are present. (Trial Tr. at 37, 38.) Pad-type insulation is attached to the sheet metal. (Trial Tr. at 37.) The facility has no floors; only the ground lies beneath each tennis court surface. (Trial Tr. at 37.) Unlike a "standard pre-engineered kit-type warehouse," the tennis facility has no concrete floor, no loading docks and no overhead doors. (Trial Tr. at 37.)

In his trial testimony, DeVoe described how the tennis facility was dissimilar to the GCM health club model. He stated that the 90% of tennis facility in question lacked these features found in the health club model: (1) foundation with reinforced concrete perimeter grade walls; (2) interior walls; (3) 10' ceiling height; (4) carpet or ceramic tile; (5) suspended acoustical tile; (6) partitions; (7) gas fired forced air heating; or (8) air conditioning. (Trial Tr. at 40.) In addition, DeVoe indicated that the tennis facility had no second story, so no comparison to the upper story characteristics for the GCM health club model was necessary. (Trial Tr. at 40.)

DeVoe also compared the tennis facility to the GCI light warehouse model. He indicated that the tennis facility possessed certain features contained in that model, including: (1) 18' floor heights; (2) some

---

17. The quoted language from *Herb* reflects testimony by the hearing officer assigned the case, as well as testimony by a State Board Commissioner. *See Herb,* 656 N.E.2d at 893. The Court in *Herb* further explained: "Thus, while the model names are reflective of use, the model specifications actually reflect the physical features that are incorporated into the structure." *Id.*

8″ hollow concrete block; and (3) 200 plus ampere service. (Trial Tr. at 41.) He stated too that, consistent with this model, the tennis facility could be classified as Unfinished. (Trial Tr. at 41.) Further, DeVoe testified that the tennis facility, as regards the 90% under review, used tennis court lighting and gas space heaters. (Trial Tr. at 40.) This contrasts with the fluorescent light fixtures and gas fired heating provided for in the light warehouse model. *See* IND. ADMIN. CODE tit. 50, r. 2.1–4–7. Also, unlike the light warehouse model, the tennis facility's indoor courts area had no hot water boiler. (Trial Tr. at 41.) DeVoe acknowledged that the tennis facility did not possess all the features of the light warehouse model. (Trial Tr. at 41.)

At trial, Hearing Officer Warrum testified that he used the health club model as his starting point for assessing the tennis facility because the Indiana Assessment Manual instructed that the health club model was the "proper schedule" to use in calculating the replacement cost for a "tennis barn." (Trial Tr. at 101–02.) *See also* IND. ADMIN. CODE tit. 50, r. 2.1–4–4. According to Warrum, had another model better matched the tennis facility's structure, he would have applied that alternative model. (Trial Tr. at 102.) However, Warrum indicated that he had found no other model more closely resembling the tennis facility's structure. (Trial Tr. at 102.) Warrum explained that he had compared the tennis facility's features with those listed in both the health club and light warehouse models. (Trial Tr. at 102.) He saw that both models deviated from the tennis facility's actual features and concluded that application of either model was a "middle-of-the-road decision." (Trial Tr. at 102.) Warrum qualified that statement by observing that the tennis facility "more closely ... resembled [the] health club [model], in that it had a health club reference in the [Indiana Assessment Manual], so I leaned that way when making the decision and adjusted from that basis." (Trial Tr. at 102.)

IRC had an affirmative duty to present evidence showing that the State Board abused its discretion in selecting the health club model. *See Herb,* 656 N.E.2d at 894. As described *supra,* the 90% of the tennis facility in dispute lacked a substantial number of features described in the health club model, such as interior walls, carpet and tile floor, 10' ceiling heights with suspended acoustical tile, and air conditioning and gas fired forced air. In contrast, this part of the building did have eighteen feet floor heights and some eight-inch hollow concrete blocks—features found in the light warehouse club model. Further, the interior of the tennis facility better matches the description Unfinished: walls are made of sheet metal with insulation attached; no ceilings are present; and there are no floors, merely tennis court surfaces. The health club model includes the Finished Open type, which describes features directly opposite those of the tennis facility, i.e., "finished walls, ceiling, and flooring." IND.CODE ANN. tit. 50, r. 2.1–4–3 (1992). Warrum primarily supports his selection of the health club model by referencing the Indiana Assessment Manuel's instructions to apply that model to "tennis barns." *See* IND. ADMIN CODE tit. 50, r. 2.1–4–4.

Substantial evidence does not support the State Board's application of the health club model to the 90% of the tennis facility under consideration. Considered in its entirety, the evidence shows that the tennis facility's features clearly better match those of the light warehouse model than those of the health club model. Therefore, the Court concludes that IRC has carried its burden to show that the State Board abused its discretion by applying the wrong model in assessing the tennis facility.

The State Board defends its assessment by explaining that Warrum "adjusted the assessment for the features this building lacked, such as interior finish, division walls, heating and air conditioning. Fur-

thermore, he adjusted the overall grade for the building down to D–1 to further account for more general differences from the selected model." [18] (Resp't Br. at 13.) It is true that Warrum adjusted the tennis facility's base rate downward because the building lacked the mentioned features; he also included a positive adjustment for additional lighting. (Trial Tr. at 104.) In all, these adjustments lowered the building's base rate from $28.65 to $19.61 per square foot. (Trial Tr. at 105; Resp't Ex. D.) It is equally true that Warrum assigned the building a grade of D minus one.[19] (Trial Tr. at 106; Resp't Ex. D.) Warrum selected this grade after pricing the building using the light warehouse model, comparing that price to his calculation using the health club model and then deriving a percentage from the ratio of those two calculations. (Trial Tr. at 106.) He derived the D minus one grade from that percentage. (Trial Tr. at 106.) Based upon Warrum's testimony as to his methodology regarding the base rate adjustments and grading, the State Board asserts that his calculations were not arbitrary or capricious decisions. (Resp't Br. at 13.)

This Court considered and rejected similar reasoning by the State Board in *Zakutansky*, where the State Board defended its use of the wrong cost schedule by arguing that adjustments to the subject improvement's base rate calculation had been made to reflect the quality of the improvement's construction. *See Zakutansky*, 696 N.E.2d at 497. The Court in *Zakutansky* concluded that the taxpayer was entitled to have his property assessed using the correct cost schedule. *See id.* "Only after this is done may adjustments for quality be made." *Id.* Applying this same rationale to the facts at hand, the Court concludes that, regardless of the appropriateness of either Warrum's adjustments or his grading, these corrections could only have been properly made after a base rate had been calculated under the correct cost schedule. Warrum applied the wrong cost schedule. Therefore, IRC is entitled to have the tennis facility valued pursuant to the correct cost schedule.

18. "To adjust for variations between the structure and the model, the State Board's regulations provide schedules showing the costs of components. For any item to which value is assigned, but does not exist in the subject building, the value assigned should be subtracted." *Wareco Enters., Inc. v. State Bd. of Tax Comm'rs*, 689 N.E.2d 1299, 1302 (Ind. Tax Ct.1997) (citing IND. ADMIN CODE tit. 50, r. 2.1–4–3). Use of these separate schedules is the "preferred method" for accounting for a building's deviations from the appropriate model and associated cost schedule. *See Whitley Prods., Inc. v. State Bd. of Tax Comm'rs*, 704 N.E.2d 1113, 1117 (Ind.Tax Ct.1998) (citations omitted). "This allows an assessor to adjust the base reproduction cost of the improvement objectively." *Id.* (citations omitted). However, an assessing official may also account for an improvement's deviation from the model via adjustment to the building's grade. *See id.* An improvement is assigned a grade based upon its material, design and workmanship. *See id.* at 1116 (citing IND. ADMIN CODE tit. 50, r. 2.1–4–3). "The grades represent multipliers that are applied to the base reproduction cost of an improvement as calculated by using the cost schedules provided in State Board regula-

tions." *Id.* (citing *Zakutansky*, 696 N.E.2d at 496 n. 5). This type of adjustment requires the assessor's subjective judgment and, "[w]here possible, ... should be avoided." *Id.* at 1117 (citations omitted).

19. The Court notes that the tennis facility in question is actually pictured in the Department's regulations at IND.CODE ANN tit. 50, r. 2.1–4–6 (1992) (codified in present form at IND.CODE ANN. tit. 50, r. 2.2–11–4.1 (1996)). The tennis facility is depicted as an example of a light warehouse with a grade of C. The picture, of course, serves only as "an indication of grade and not a determination of the actual grade factor of the structure shown." *Id.* The Court realizes that the "light warehouse" caption likewise does not mean that the State Board has determined that the light warehouse model applies in assessing the building's value. The Court does understand, though, how IRC might reasonably question the merits of the State Board's decision when the very regulations it interprets as defeating IRC's claim appear on their face to directly support IRC's contention that the light warehouse model most closely resembles the tennis facility's actual structure.

The Court concludes that the State Board abused its discretion by applying the health club model in determining the tennis facility's reproduction cost. Upon remand, the State Board must apply the model that most closely resembles the physical structure of the tennis facility area being considered and recalculate the facility's reproduction costs based upon that model.

## CONCLUSION

For the foregoing reasons, the Court hereby REVERSES the State Board's final assessment determinations and REMANDS these causes to the State Board for further proceedings consistent ·with this opinion.[20] Racquet Club is reminded that, on remand, it bears the burden of going forward with probative evidence con-

cerning the proper classification of Parcels A, B and C within the Order and the appropriate base rate to be assigned the parcels. *See Whitley Prods.*, 704 N.E.2d at 1121. In like manner, IRC must come forward with probative evidence concerning the appropriate model to use in calculating the base rate for the 90% of its indoor tennis facility at issue, including but not limited to evidence regarding the proper grade to be assigned the subject improvement.[21] *See id.*

20. In its appeal of Parcel A, IRC identifies a mathematical error on the property record card. The property record card indicates that Parcel A has eight tennis courts valued at $8300 each, with a total reproduction cost of $88,300. (Pet. for Original Tax Appeal, ¶ 7 ¶ Ex. B.) However, eight multiplied by $8300 equals $66,400. Thus, the property record card overstates the assessed value of the tennis courts by $21,900. In its Answer to IRC's petition, the State Board admits that the error exists but denies that the error was raised during the prior administrative proceedings. (Resp't Answer, ¶ 7.) Therefore, the State Board contends that no relief should be granted as to this miscalculation. (Resp't Answer, ¶ 7.) However, Warrum testified that he prepared property record cards reflecting changes that he made. (Trial Tr. at 86.) Warrum's property record card for Parcel A was admitted as Respondent's Exhibit E. This exhibit contains the calculation error in question. Because Warrum made the error

after hearing IRC's appeal, IRC did not have the opportunity to challenge his mistake until raising the issue during the original tax appeal of Parcel A. Therefore, the Court concludes that, upon remand, the State Board should correct the obvious mathematical error as requested by IRC.

21. While IRC has demonstrated that the light warehouse model is better than the health club model, for purposes of assessing the disputed 90% of the tennis facility, the State Board on remand may consider whether a different model even more closely resembles the tennis facility's physical structure. Also, as IRC correctly observes, the Department's regulations permit application of a separate base rate for each distinct area of a building with two or more use types. *See* IND. ADMIN. CODE tit 50, r. 2.1–4–1 (1992) (providing formula for determining base rate for mixed use building) (codified in present form at IND. ADMIN. CODE tit 50, 2.2–10–2 (1996)).