**INLAND STEEL COMPANY,**
Petitioner,

v.

**STATE BOARD OF TAX COMMISSIONERS,**
Respondent.

No. 49T10–9803–TA–00027.

Tax Court of Indiana.

Nov. 22, 2000.

Stephen H. Paul, Matthew R. Gutwein, Baker & Daniels, Indianapolis, Indiana, Michael B. Shapiro, Honigman Miller Schwartz & Cohn, Detroit, Michigan, Attorneys for Petitioner.

Karen M. Freeman–Wilson, Attorney General of Indiana, Vincent S. Mirkov, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Respondent.

FISHER, J.

Inland Steel Company (Inland) appeals the final determination of the State Board of Tax Commissioners (State Board) fixing the assessed value of its property (Plant 2) as of March 1, 1993. Inland presents several issues for this Court's consideration. The Court consolidates and restates these issues as follows:

I. Whether the State Board properly calculated Plant 2's functional obsolescence due to excess construction costs, excess operating expenses, and excess inventory and capital costs;

II. Whether the State Board applied the appropriate model in calculating the base reproduction costs for Plant 2's Major Buildings; and

III. Whether the State Board applied the proper grades to Plant 2's Basic Oxygen Furnace (BOF) Buildings and Major Buildings.[1]

1. Inland and the State Board classify the buildings in Plant 2 into two basic categories,

## FACTS AND PROCEDURAL HISTORY[2]

Inland is a Delaware corporation engaged in business in the State of Indiana. Inland owns a large integrated steel production plant located in East Chicago, Indiana. The plant was initially constructed in 1901 and has been modified over the years; it consists of facilities designated as Plant 1, Plant 2, Plant 3 and Plant 4. Inland owns several hundred buildings, which are located on several parcels of land. The overwhelming majority of Inland's improvements—including the plant's principal operating segments—are part of Plant 2, which is the subject of this original tax appeal.

On January 24, 1995, Inland filed a Form 131 petition for review challenging Plant 2's assessment as of March 1, 1993. A hearing regarding Inland's petition was held on October 30, 1995. Supplemental hearings were held on June 17–19, 1996. On February 19–20, 1997, the State Board's hearing officers met with Inland's representatives to "analyze and audit the supporting data to certain answers to questions the State Board had submitted to Inland." (Resp't Br. at 2). The State Board, on July 29, 1997, issued its proposed final assessment determination. Another supplemental hearing was held on August 28, 1997, and on November 4, 1997, the State Board conducted a final hearing. On February 16, 1998, the State Board issued its final determination, assigning Plant 2 a total value of $35,834,200 ($2,950,430 for land and $32,883,770 for improvements).

Inland filed its original tax appeal petition on March 27, 1998. The Court conducted a trial in this matter on January 12, 1999. Oral arguments were heard on October 5, 1999. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■■■ This Court gives the final determinations of the State Board great deference when the State Board acts within the scope of its authority. *Wetzel Enters., Inc. v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1259, 1261 (Ind.Tax Ct.1998). Accordingly, this Court reverses final determinations of the State Board only when those decisions are unsupported by substantial evidence, are arbitrary or capricious, constitute an abuse of discretion or exceed statutory authority. *Id.* The taxpayer bears the burden of demonstrating the invalidity of the State Board's final determination. *Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1233 (Ind.Tax Ct.1998).

### Discussion

#### I. FUNCTIONAL OBSOLESCENCE

Inland argues that the State Board erroneously calculated Plant 2's functional obsolescence. Specifically, Inland contends that it presented a prima facie case supporting its identification and quantification of functional obsolescence and that the State Board failed to sufficiently refute this prima facie case. According to Inland, the State Board did not support its final determination with substantial evi-

for purposes of this appeal—the BOF Buildings and the Major Buildings. In its brief, Inland lists the individual buildings that comprise these two groupings. (Pet'r Br. at 25 n. 2 & 40 n. 7.) The Court will use these same categories in this opinion.

2. Pursuant to IND.CODE ANN. § 6–1.1–35–9(a) (West 2000), which allows all information related to earnings, income, profits, losses, or expenditures to remain confidential, the Court will not disclose certain facts that were

admitted into the record. (Trial Tr. at 7.) The State Board has agreed to Inland's request for confidentiality. *Id.* Therefore, the facts consist only of information that provides sufficient background information to understand the basic facts and procedural history of this case. Also, the parties have stipulated to certain facts by highlighting those facts on a copy of the final determination that was submitted to the Court on January 15, 1999. (Submission of Stipulations at 1.)

dence. In response, the State Board asserts that it properly used its discretion in calculating Plant 2's functional obsolescence.

Inland presents various sub-issues for consideration. These involve challenges to the State Board's calculation of functional obsolescence due to excess construction costs, excess operating expenses, and excess inventory and capital costs. First, the Court will review the definition of functional obsolescence and the methodology for calculating functional obsolescence. Next, the Court will consider the evidence needed to support a prima facie case of functional obsolescence. Finally, the Court will address each of Inland's sub-issues.

■■■ Obsolescence, which is a form of depreciation, is defined as a loss of value and is classified as either functional or economic. *Freudenberg–NOK Gen. Partnership v. State Bd. of Tax Comm'rs*, 715 N.E.2d 1026, 1029 (Ind.Tax Ct.1999) (citing IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (1992) (codified in present form at *id.*, r. 2.2–10–7(e) (1996))), *review denied*. Functional obsolescence is either a physical element that buyers are unwilling to pay for or a deficiency that impairs the utility of a property when compared to a more modern replacement, leading to a loss in value.[3] *Id.* (citing Michael D. Larson, *Identifying, Measuring, and Treating* *Functional Obsolescence in an Appraisal,* 10 J. PROP.TAX MGMT. 42, 44 (1999)). It is caused by factors internal to the property and is evidenced by conditions within the property. *Pedcor Invs. v. State Bd. of Tax Comm'rs*, 715 N.E.2d 432, 435 (Ind. Tax Ct.1999) (citations omitted). As the State Board's regulations explain, "Functional Obsolescence may be due to a poor floor plan, mechanical inadequacy or superadequacy, functional inadequacy or superadequacy due to size, style, age, or other losses." IND.ADMIN.CODE tit. 50, r. 2.1–5–1. Functional obsolescence works as a penalty against the property's value. Larson, *supra* at 44. The State Board expresses this penalty in terms of a percentage reduction from the subject property's value; the obsolescence deduction can range from 0% to 95%.[4] IND.ADMIN.CODE tit. 50, r. 2.1–5–1.

■■■ The determination of obsolescence is a two-step inquiry. *Freudenberg–NOK*, 715 N.E.2d at 1029. The regulations require that an assessor first identify the causes of obsolescence and then quantify the amount of obsolescence to be applied. *Id.; see also* IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (stating that accurate determination of obsolescence requires an assessor to "recognize the symptoms of obsolescence and exercise sound judgment in equating his observation of the property to the correct deduction in value . . . ."). The

3. The Appraisal Institute defines functional obsolescence as a "loss in value resulting from defects in design. It can also be caused by changes that, over time, have made some aspect of a structure, such as materials or design, obsolete by current standards." APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 352 (10th ed.1992). The Institute of Property Taxation instructs that functional obsolescence is a "form of depreciation resulting in loss of value due to lack of utility or desirability inherent in the design of the property." INSTITUTE OF PROPERTY TAXATION, PROPERTY TAXATION 114 (Jerrold F. Janata ed., 2d ed.1993).

4. The adjustment for obsolescence depreciation is applied using the "Remainderment Method." IND.ADMIN.CODE tit. 50, r. 2.1–5–1. With this method, an assessing official determines a property's "remaining value," which is its reproduction cost minus physical depreciation suffered by the property. *Id.* The obsolescence reduction is then applied to this remaining value, resulting in the property's true tax value. *Id.; see also* IND .CODE ANN. § 6–1.1–31–6(c) (West 2000) (providing that true tax value does not mean fair market value but rather is the "value determined under the rules of the [State Board]"). The State Board illustrates the Remainderment Method and the calculation of true tax value as follows:

REPRODUCTION COST—PHYSICAL DEPRECIATION = VALUE [and] VALUE—OBSOLESCENCE DEPRECIATION = TRUE TAX VALUE.

IND.ADMIN.CODE tit. 50, r. 2.1–5–1.

State Board's regulations provide no specific guidance as to how obsolescence should be quantified. *Clark,* 694 N.E.2d at 1240. However, one permissible means of quantifying obsolescence under the true tax value system is the use of "generally recognized appraisal methods." *Id.* at 1242 n. 18 (citations omitted). Ultimately, the State Board must support its quantification of obsolescence with substantial evidence.[5] *Id.* at 1240.

■■■■■ As with all challenges to final determinations issued by the State Board, a taxpayer challenging the State Board's quantification of obsolescence must submit probative evidence sufficient to establish a prima facie case demonstrating the invalidity of the State Board's final determination. *See Western Select Properties v. State Bd. of Tax Comm'rs,* 639 N.E.2d 1068, 1075 (Ind.Tax Ct.1994); *King Indus. Corp. v. State Bd. of Tax Comm'rs,* 699 N.E.2d 338, 343 (Ind.Tax Ct.1998). A prima facie case is one consisting of evidence that is "sufficient to establish a given fact and which if not contradicted will remain sufficient [to establish that fact]." *Canal Square Ltd. Partnership v. State Bd. of Tax Comm'rs,* 694 N.E.2d 801, 804 (Ind. Tax Ct.1998) (citation omitted). The evidence needed to make a prima facie case "depends on the issues raised by the [taxpayer's] challenge."[6] *Clark,* 694 N.E.2d at 1234.

■■■■■ Probative evidence is evidence that "tends to prove or disprove a point in issue." *Sterling Management–Orchard Ridge Apartments v. State Bd. of Tax Comm'rs,* 730 N.E.2d 828, 833 (Ind.Tax Ct.2000) (quoting BLACK'S LAW DICTIONARY 579 (7th ed.1999)), *reh'g denied. Cf. Phelps Dodge v. State Bd. of Tax Comm'rs,* 705 N.E.2d 1099, 1104–05 (Ind. Tax Ct.1999) (providing examples of probative evidence that taxpayer could submit regarding physical depreciation), *review denied.* Conclusory statements are not probative evidence. *CDI, Inc. v. State Bd. of Tax Comm'rs,* 725 N.E.2d 1015, 1019 (Ind.Tax Ct.2000). *Cf. Heart City Chrysler v. State Bd. of Tax Comm'rs,* 714 N.E.2d 329, 333 (Ind.Tax Ct.1999) (stating that references to photographs and regulations, without explanation, are not probative evidence). A taxpayer's appraisal, if it quantifies obsolescence according to generally recognized appraisal principles, may constitute probative evidence that supports a prima facie case. *Canal Square,* 694 N.E.2d at 807. When a taxpayer offers probative evidence, the State Board must deal with the evidence in some meaningful

5. The substantial evidence requirement "facilitates judicial review and protects due process rights." *Clark,* 694 N.E.2d at 1240 (citations omitted). Moreover, given the complexity involved in calculating obsolescence, it is imperative that the State Board provide an authoritative explanation for its calculation. *Cf. Thorntown Tel. Co. v. State Bd. of Tax Comm'rs,* 629 N.E.2d 962, 966 (Ind.Tax Ct.1994) ("The complexity involved in calculating ... economic obsolescence percentages makes it imperative that the State Board supply authoritative explanation and evidence demonstrating that economic obsolescence is indeed accounted for in its method.").

6. For example, circumstances may require the taxpayer to offer evidence supporting a competing view of the disputed assessment. *Clark,* 694 N.E.2d at 1234. In other cases, a taxpayer may simply have to show that the State Board's assessment was inaccurate. *Id.* In still other situations, the taxpayer may

need to establish that the State Board acted improperly in arriving at its final determination. *Id.* The Court notes that, to the extent that its discussion in *Clark,* 694 N.E.2d at 1234, suggests that a prima facie case is only required where the taxpayer has chosen or is required to offer evidence of a competing view of an assessment, such an interpretation is overly restrictive. A prima facie case must be presented in all cases where a taxpayer challenges the validity of the State Board's final determination. *See Canal Square,* 694 N.E.2d at 804; *King Indus.,* 699 N.E.2d at 343. *Cf. Peabody Coal Co. v. Ralston,* 578 N.E.2d 751, 754 (Ind.Ct.App.1991) (observing that, as in criminal prosecutions, the "burden of production may shift to the alleged violator [of agency's rules] when the agency pursuing [punitive] sanctions for the violation has demonstrated a *prima facie* case of violation, but the ultimate burden of persuasion may never so shift" because to do otherwise would be "fundamentally unfair").

manner. *Clark,* 694 N.E.2d at 1235. Once the taxpayer has submitted probative evidence establishing a prima facie case, the burden of production shifts to the State Board; the State Board must then rebut the taxpayer's evidence and support its final determination with substantial evidence. *Id.* at 1233. *See also Thorntown Tel. Co. v. State Bd. of Tax Comm'rs,* 629 N.E.2d 962, 965 (Ind.Tax Ct.1994) (observing that, while a taxpayer's burden of proof may not shift, the duty of going forward may shift several times). "If the State Board fails to make any findings as to evidence rebutting the taxpayer's prima facie case, or enters unsupported conclusions or findings, the State Board's decision will be reversed." *Canal Square,* 694 N.E.2d at 805.[7]

## A. *Excess Construction Costs*

Inland claims that the State Board erroneously calculated Plant 2's functional obsolescence due to excess construction costs. Inland asserts that the State Board failed to apply the actual physical depreciation applicable to Plant 2, which had a composite age of forty-four years as of March 1, 1993, in determining the facility's replacement cost.[8] Rather, according to Inland, the State Board erroneously substituted the physical depreciation allowance for a hypothetical building that had been built only fifteen years prior to the assessment date. The State Board responds that it properly exercised its discretion in using a fifteen-year age to calculate the replacement facility's physical depreciation.

Measurement of functional obsolescence is most often associated with the cost approach to valuing property. Larson, *supra* at 43 (comparing cost approach with the two other approaches to classical appraisal theory, the "sales comparison" and "income capitalization" approaches).[9] The cost approach "considers the cost to reproduce or replace the property appraised. From this amount, a deduction is made for all forms of depreciation present, whether arising from physical, functional, or economic causes." Larson, *supra* at 43; *see also* APPRAISAL INSTITUTE, *supra* at 313–23 (describing basics of cost approach); IND.ADMIN.CODE tit. 50, r. 2.1–6–1 (1992) (codified in present form at *id.,* r. 2.2–1–19 (1996)) (defining "cost approach").[10] The cost ap-

7. The Court must reverse a final determination if it is unsupported by substantial evidence. *Clark,* 694 N.E.2d at 1234. However, the State Board's duty to support its final determinations with substantial evidence is not triggered until the taxpayer presents a prima facie case as to the issues in dispute. *See Whitley Prods., Inc. v. State Bd. of Tax Comm'rs,* 704 N.E.2d 1113, 1119–20 (Ind.Tax Ct.1998) (finding that taxpayer presented no probative evidence as to grade and therefore concluding that taxpayer "failed to place the grading of the subject improvement at issue so as to trigger the substantial evidence standard"); *King Indus.,* 699 N.E.2d at 343. *But cf., infra,* op. at 228.

8. "Physical Depreciation is the impairment of condition as a result of wear and tear and disintegration." IND.ADMIN.CODE, tit. 50, r. 2.1–5–1 (1992). A structure's physical depreciation is based upon its age, condition, and structure type. *Phelps Dodge,* 705 N.E.2d at 1103 (citing IND.ADMIN.CODE tit. 50, r. 2 .1–5–1). "An improvement's physical depreciation is expressed as a percentage. This percent-

age is determined by ascertaining the age and condition of the improvement and then consulting the economic life table corresponding to the structure type of the improvement." *Id.* (citations omitted).

9. The Court identified these three valuation methods in *Town of St. John v. State Board of Tax Commissioners,* 690 N.E.2d 370, 379 (Ind.Tax Ct.1997) (*St. John III*) (identifying the three recognized methods of determining value using market data, including the "reproduction cost minus depreciation method"), *review granted.* However, in affirming in part and reversing in part this Court's opinion in *St. John III,* the Indiana Supreme Court stated that the State Board's regulations are "not required to use all three standard market-value measures of value in its assessment system." *State Bd. of Tax Comm'rs v. Town of St. John,* 702 N.E.2d 1034, 1041 (Ind.1998).

10. The cost approach is based upon the principle of substitution, which "affirms that no prudent buyer would pay more for a property

proach is concerned with two types of cost new: cost of reproduction and cost of replacement. *See* Larson, *supra* at 46. Cost of reproduction refers to the estimated amount to reproduce a duplicate or replica of the subject improvement in like kind and materials; cost of replacement is the estimated amount required to replace the entire improvement at one time with a modern new unit using the most current technology and construction materials. *Id.; see also* APPRAISAL INSTITUTE, *supra* at 318–19 (defining reproduction and replacement costs). "The important underlying distinction to be made with respect to the concepts of reproduction cost and replacement cost is that the reproduction cost is the cost to construct an exact duplicate, whereas the replacement cost is the cost of constructing a building of equal utility." Larson, *supra* at 46–47.

▉ Superadequate construction and excess construction are two forms of functional obsolescence.[11] Superadequate construction "represents the existence of past construction practices that are not currently used to build facilities of a like utility."

Larson, *supra* at 47. Excess construction, in turn, "represents the existence of current building volume that is [neither] currently nor likely to be used in the future."[12] *Id.*

▉ Functional obsolescence due to excess construction cost is usually quantified by calculating the difference between the subject improvement's cost of reproduction and its cost of replacement. *Id.* However, as mentioned *supra* note four, the State Board's regulations require first that an improvement's physical depreciation be deducted from its reproduction cost and second that the obsolescence reduction be applied to the improvement's remainder value. IND.ADMIN.CODE tit. 50, r. 2.1–5–1. As properly explained by Inland, the full amount of functional obsolescence due to excess construction cost cannot be subtracted from remainder value under this method, because some of the obsolescence has already been deducted as physical depreciation. Therefore, in Indiana, an assessing official must determine the subject improvement's depreciated excess construction cost in calculating an improvement's functional obsolescence.[13]

---

than the cost to acquire a similar site and construct improvements of equal desirability and utility without undue delay." APPRAISAL INSTITUTE, *supra* at 313.

11. Inland refers only to excess construction costs in its briefs. However, its arguments clearly use the term to identify both superadequate and excess construction costs. For ease of reference and to avoid confusion, the Court's opinion will use the term "excess construction" to refer to both superadequate and excess construction.

12. As an example of superadequate construction, Larson states that, using today's construction techniques, "solid-brick or brick-on-concrete-block wall construction would be replaced with metal-clad steel frame construction." Larson, *supra* at 47. In addition, an example of excess construction "might be vacant or abandoned building space, such as an automated storage and retrieval (ASRS) warehouse space, which, due to its physical layout design, renders it useless." *Id.* at 47–48.

13. To explain why this is so, Inland provided the Court with a hypothetical example, which

assumes that a subject improvement has a reproduction cost of $150, a replacement cost of $100 and is subject to physical depreciation of 40%. (Pet'r Br. at 15–16) (Trial Tr. at 163–70, 197–200.) This hypothetical, with minor alterations, is included in the APPENDIX to this opinion. Under the traditional appraisal method for determining an improvement's depreciated cost (where the only obsolescence involved is excess construction cost), an assessing official would subtract the structure's replacement cost ($100) from its reproduction cost ($150) to arrive at its excess construction cost ($50). Having determined this, the adjustment for physical depreciation is then applied to the replacement cost ($100 × .40 = $40). The improvement's total depreciated cost is determined by subtracting the combined excess construction cost and physical depreciation adjustment ($50 + $40 = $90) from the reproduction cost ($150–$90 = $60). *Compare with* Larson, *supra* at 51–52 (providing an eight-step · formula "for accounting for each form of depreciation" that begins by subtracting an improvements functional obsolescence due to superadequate and excess construction from its cost of reproduc-

To determine depreciated excess construction cost, both parties generally applied the same methodology in subtracting replacement cost less physical depreciation from remainder value (which is reproduction cost less physical depreciation), see *supra* note 13.[14] The dispute between the parties involves the source used for determining the physical depreciation of the replacement facility. Inland claims that Plant 2's composite age of forty-four years should be used to calculate the physical depreciation adjustment for the replacement facility. Inland submitted Exhibit 31, its Functional Obsolescence Study, to support its quantification of depreciated excess construction cost. Mr. Lee P. Hackett, the Executive Vice President of American Appraisal Associates, authored the study (Hackett Study). (Trial Tr. at 141.) In its final determination, the State Board found the Hackett Study to be "generally scientifically reliable" and identified Mr. Hackett as an expert in the "field of industrial appraisal" who "applied well accepted principles of appraisal and valuation" in his study. (Finding # 108.) The Hackett Study does not state what composite age it assigned the replacement plant. However, it did apply to the replacement plant a physical depreciation percentage of 48%—the same percentage that was applied in determining the remainder value of Inland's four plants. (Hackett Study, Ex. A at·17.)

In contrast, the State Board assigned the replacement plant an age of fifteen years. Finding # 118 of the State Board's final determination states:

> The Replacement Plant has a layout even more efficient than that of the last

tion to arrive at its cost of replacement, before going on to subtract various other forms of depreciation).

Using the same assumptions, to calculate the improvement's true tax value under the State Board's regulations, an assessing official would first apply the physical depreciation adjustment to the improvement's reproduction cost to arrive at a remainder value of $90 ($150 × .40 = $60 and $150–$60 = $90). If, at this point, the total excess construction cost of $50 was applied, the improvement's true tax value would be $40 ($90–$50 = $40)—$20 less than the figure produced using the traditional method. Therefore, the assessing official must first determine the depreciated excess construction cost by (1) multiplying the full excess construction cost ($50) by the physical depreciation adjustment (40%) and (2) subtracting this value from the full excess construction cost. In Inland's hypothetical, $50 is multiplied by 40%, which creates a value of $20. The $20 is subtracted from $50, and the resulting $30 represents the depreciated excess construction cost. As Inland aptly states, the "$20 of the excess construction cost ... has already been deducted as physical depreciation." (Pet'r Br. at 15.) As a percentage reduction, the $30 is 33 1/3% of the improvement's $90 remainder value. (Trial Tr. at 166–67.) Though not explicitly described in Inland's hypothetical, an improvement's depreciated excess construction cost can also be determined by subtracting the improvement's replacement costs less the physical depreciation adjustment ($100–$40 = $60) from its re-mainder value ($150–$60 = $90). (Pet'r Br. at 13.) The same result for depreciated excess construction cost is achieved ($90–$60 = $30). Inserting the $30 into the true tax value formula, $150 (reproduction cost) minus $60 (physical depreciation adjustment of 40%) equals a remainder value of $90. Subtracting $30 (depreciated excess construction cost) from the $90 equals a true tax value of $60; this, of course, is the same value produced using the traditional method.

14. Both parties in calculating excess construction cost first determined the excess construction cost associated with all four plants and then reduced this figure by a percentage representing the excess construction cost for only Plant 2. The State Board subtracted the remainder value of the replacement plant ($240,823,656) from the collective remainder value of Plants 1–4 ($256,562,569) and then multiplied this figure ($15,738,913) by 82% (Plant 2's percentage of all improvements throughout the four plants) to reach a final value of $12,905,909 of excess construction cost for Plant 2. (Finding # 119 & 120.) By comparison, in calculating the excess construction cost for Plant 2's improvements, Inland's Hackett Study, Ex. A at 1, discussed *infra*, determined the ratio of excess construction cost of all plants ($83,289,570) to the remainder value of all plants ($223,019,530) and applied this percentage (37%) to the remainder value of Plant 2 ($183,226,020) in computing a value of $67,793,630 for excess construction cost.

greenfield steel mill built in the United States, the Bethlehem Burns Harbor Plant.... This was a plant layout that became feasible only around 1970. Therefore, it is unreasonable to use the remainder value of Plant 2 to derive the cost of the Replacement Plant. No replacement plant with a layout similar to that of the Replacement Plant could have been built before the mid 1970's, so all of the Replacement Plant should be depreciated as if it were 13–17 years old as of the 1989 reassessment date. Because a replacement plant of a design similar to the Replacement plant could not have been built until the mid 1970s, a 44 year old replacement plant does not satisfy the principle of substitution, because no prospective purchaser, or under true tax value no operator of a steel mill, would have the ability to compare a 44 year old replacement plant to a 44 year old integrated mill. The replacement plant, if it existed at all, and it does not, would be 15 years old as of the 1989 [general] reassessment date. Therefore to be a valid substitute, the replacement plant must be treated as if it were 15 years old.

(Finding # 118.) The State Board essentially reasoned that the hypothetical replacement plant could not have been built until approximately fifteen years prior to the 1989 general reassessment date and thus could not have been subjected to forty-four years of wear and tear as of the assessment date in question, March 1, 1993. Ultimately, the State Board applied a 20% physical depreciation to the replacement facility. (Finding # 119.)

The Hackett Study, made pursuant to generally recognized appraisal principles, establishes a prima facie case as to a proper method for quantifying Plant 2's functional obsolescence due to excess construction cost. As previously mentioned, in the study Inland applied the same percentage of physical depreciation to the replacement plant as was applied in the determination of the remainder value of Plants 1–4.

(Hackett Study, Ex. A at 17.) At trial, Mr. Hackett explained that, whether the appraising official started with reproduction cost or replacement cost, the same depreciation percentage should be applied. (Trial Tr. at 149.) This is because the appraiser is trying to arrive at the depreciated cost of the subject improvement, not that of a hypothetical structure. (Trial Tr. at 149–50.) According to Mr. Hackett, it makes no sense to deduct different depreciation percentages, because the objective is to reflect the physical condition of the subject property. (Trial Tr. at 150.) Another expert witness, Dr. Jeffrey Fisher of the Kelley School of Business at Indiana University in Bloomington, Indiana, agreed with this position, stating, "It's the subject property that has suffered the loss in value due to depreciation, so it is the subject property that we have to use as the basis for determining depreciation." (Trial Tr. at 196.) Dr. Fisher opined that the date upon which a replacement improvement could have been built it is irrelevant, as long as it could have been constructed on the date of assessment. (Trial Tr. at 200.)

The testimony of these witnesses is logical. Determining excess construction cost involves comparisons of the costs new of two hypothetical buildings: an exact replica of the subject improvement and a modernized, yet equally efficient, building. As "new" structures, these fictitious buildings in theory suffer no physical depreciation whatsoever. Because Indiana is concerned with the depreciated excess construction cost of an improvement, physical depreciation must first be applied to the hypothetical buildings before replacement cost is subtracted from the cost of reproduction. If the same percentage of physical depreciation is not assigned to both buildings, the resulting figure will not accurately reflect the subject improvement's depreciated excess construction cost. Such cost will be arbitrarily lowered. In effect, in arriving at the subject improvement's true tax value, part

of the physical depreciation subtracted in arriving at remainder value will be added back in the form of a lower value for excess construction cost.

The State Board correctly observes that it has the "discretion to chose between valid methods in calculating functional obsolescence." (Resp't Br. at 3.) While Finding # 118 explains why the State Board treated the replacement plant as if it were fifteen years old, it offered no authoritative explanation of this decision. Instead, Finding # 118 is an unsupported, conclusory statement. In contrasts, through expert testimony and by the Hackett Study, Inland established a prima facie case as to a proper methodology for quantifying functional obsolescence due to excess construction cost, with respect to the need to apply the same physical depreciation percentage deduction to both an improvement's reproduction and replacement costs.

The State Board identified no valid appraisal principle refuting Inland's methodology and presented no probative evidence supporting its conclusion on this sub-issue. In Finding # 115, the State Board does argue that the replacement plant is not a "realistic alternative" to Plant 2. This, according to the State Board, is because the replacement plant compares a forty-four year old subject facility to a forty-four year old replacement plant. Thus, the State Board implies, the replacement plant violates the principle of substitution because a prudent buyer would not purchase a replacement building having an equal level of wear and tear. The State Board is mistaken. As previously noted, *supra* note 10, the principle of substitution concerns a prudent buyer's desire to pay no more for property than the cost to "construct improvements of equal *desirability and utility.*" APPRAISAL INSTITUTE, *supra* at 313 (emphasis added). The Hackett Study indicates that the replacement plant "was developed by Inland and its consultant ... to achieve the utility of the Inland Facility." (Hackett Study at 6.) Finding # 115 is conclusory and thus provides no evidence that the hypothetical replacement facility in the present case is either less desirable or less useful and efficient than Plant 2 as it is currently designed and constructed. Therefore, the Court considers Inland's replacement facility to be a realistic alternative to Plant 2.

The fifteen-year age applied by the State Board resulted in a lower depreciation percentage being assigned to Plant 2's cost of replacement than was assigned to its cost of reproduction. The State Board offered only conclusory statements in support of its decision. These did not rebut Inland's prima facie case as to a methodology for quantifying Plant 2's excess construction cost. Neither Finding # 115 nor Finding # 118 is supported by substantial evidence; Inland has demonstrated that both findings are invalid. The Court finds that the State Board abused its discretion in applying a fifteen-year age to the replacement plant, for purposes of calculating its applicable level of physical depreciation. Therefore, its decision on this sub-issue is REVERSED. This sub-issue is REMANDED to the State Board with instructions to calculate Plant 2's depreciated excess construction cost using an age for the replacement plant that results in the same percentage adjustment for physical depreciation being applied to both Plant 2's cost of reproduction and its cost of replacement.

### B. *Excess Operating Expenses & Excess Inventory and Capital Costs*

Inland raises three sub-issues regarding the State Board's calculations of Plant 2's functional obsolescence due to excess operating expenses and excess inventory and capital costs (collectively Penalties). First, Inland claims that the State Board should have adhered to accepted appraisal methodology and calculated the Penalties over the remaining useful life of Plant 2. Second, Inland asserts that the State Board mistakenly applied a three percent annual inflation rate, rather than the actual change in the Producer Price Index, to

convert the excess operating expenses and the excess inventory costs from 1993 dollars to 1985 dollars. Third, Inland contends that the State Board erroneously reduced the Penalties for Plant 2 by fifteen percent after having adjusted the dollar values for the Penalties from 1993 to 1985 dollars. The Court will discuss the nature of these Penalties and then consider each sub-issue in turn.

■ "Operating expenses are the periodic expenditures necessary to maintain the real property and continue the production of the effective gross income." AP-PRAISAL INSTITUTE, *supra* at 444. Functional obsolescence from excess operating costs is present when the subject property's "design results in operating inefficiencies that cause higher expenses for the owner or occupant."[15] Larson, *supra* at 48. This penalty is measured by estimating the increase in operating expenses for the subject property over the modern replacement. *Id.; see also* APPRAISING MACHINERY AND EQUIPMENT 98 (John Alico ed., 1989) (stating that calculation of functional obsolescence due to excess operating costs or "operating obsolescence" involves a "comparison of the operating characteristics of the subject property to its modern equivalent").

■ Excess inventory and capital costs are other forms of functional obsolescence. Excess inventory refers to the cost of carrying additional inventory, in raw materials or semi-finished products, because of the inefficient production process required by the subject facility's design.[16] (Trial Tr. at 156.) In comparison, excess capital costs (or necessary capital expenditures) represent "equipment and improvements that the buyer considers necessary to operate the property into the future."[17] Larson, *supra* at 48. These extra costs reduce the amount a prospective buyer would be willing to pay for the subject facility. *Id.*

### 1. Remaining Useful Life

■ Inland maintains that, according to generally accepted appraisal principles, excess operating expenses and excess inventory costs must be calculated over the remaining useful life of Plant 2. The Hackett Study applied a ten-year useful life to most of Inland's operations.[18] However, the State Board disagreed, imposing a six-year limitation on excess operating costs and a two-year period on excess inventory and capital costs. (Findings # 158 & 161.) The six-year period represented the time between Indiana's general reassessments, and the State Board reasoned that an assessor should not consider effects extending beyond this limited period—an approach that it deemed to be "consistent with true tax value's status as a value in use assessment system." (Finding # 158.)

There is authority supporting Inland's position. Larson, *supra* at 48, asserts that the present value of functional obsolescence due to excess operating expenses is

---

15. "Some elements of excess operating cost include labor, material, equipment, utilities, and taxes." Larson, *supra* at 48. An example of excess operating expenses is the "additional material-handling costs associated with moving raw or finished materials between multiple buildings; in a replacement facility, the operations would be adjacent to each other." *Id.*

16. In the Hackett Study, Inland refers to excess inventory and capital costs as "excess capital investments" that are divided into two categories: excess inventory investments and redundant equipment investments. (Hackett Study at 13.)

17. An example of excess capital costs is the need for additional forklifts or tractor-trailers for moving materials throughout a multi-building manufacturing facility. Larson, *supra* at 48. This equipment would not be necessary and would therefore be deemed redundant if the replacement facility used a conveying or direct feed mechanism. (Trial Tr. at 156.)

18. The study applied a three-year period to its plate operations. (Hackett Study, Exs. F at 1 & H at 1.) Also, the parties have stipulated that the total annual excess operating expenses is $19,500,000. (Finding # 156.)

"calculated by discounting the annual excess operating cost, net of all tax benefits, over the remaining life of either the deficiency or the improvement, to arrive at an indication of the present value." In addition, APPRAISING MACHINERY AND EQUIPMENT, *supra* at 98, states:

Operating obsolescence can be defined as the present worth of the future excess operating costs. The subject property will continue to incur an additional expense over and above that of a modern facility. The penalty will continue until either the problem is corrected, the assets wear out, or, in extreme cases, the company goes out of business.

*See also* INSTITUTE OF PROPERTY TAXATION, *supra* at 118 (providing example wherein penalty for excess operating cost is calculated based upon remaining economic life of building). Oregon's Supreme and Tax Courts have previously considered and implicitly acknowledged the propriety of determining excess operating expenses over the remaining useful life of the subject facility. *See Reynolds Metals Co. v. Department of Revenue*, 258 Or. 116, 477 P.2d 888, 891–93 (1970) (en banc) (accepting calculations of appraiser who determined present value of excess operating expenses based on ten-year remaining life of plant), *reh'g denied; Oregon Portland Cement Co. v. Department of Revenue*, 8 Or.Tax 78, 94–95, 1979 WL 1812 (1979) (analyzing and generally approving of two competing assessments, both of which determined excess expenses over plant's useful life); and *Reynolds Metals Co. v. Department of Revenue*, 9 Or.Tax 417, 423, 1984 WL 3215 (1984) ("In order to process the net operating costs into an estimate of functional obsolescence, one must determine the remaining economic life of the property and the appropriate rate of return for the subject industry.").

In addition, Mr. Hackett described the process for quantifying excess operating expenses as follows:

Generally, when you are looking at excess operating expenses, you compare your subject plant's operations in the various different categories of operations within that facility with the replacement facility and its similar groups or categories of operations. And you develop an annual or yearly excess operating expense, and then that amount is capitalized or discounted over the remaining useful life of the facility that will generate that annual operating expense.

(Trial Tr. at 153.) Dr. Fisher applied this same method for quantifying excess operating expenses, explaining "You would take the present value of the annual cost over the remaining economic or remaining useful life of the property." (Trial Tr. at 204.) Mr. Hackett further instructed that, as regards excess inventory, the concern is calculating the "opportunity cost lost by having that investment tied up over the remaining useful life of . . . the subject facility." (Trial Tr. at 158.)

The Hackett Study applied this methodology for excess operating and inventory costs. The State Board admits that the Hackett Study's "overall approach used to calculate penalties [is] credible. . . ." (Finding # 123.) The Court agrees that the Hackett Study is credible and further finds that it is based upon generally accepted appraisal principles. Therefore, the Hackett Study establishes a prima facie case as to the correct methodology for calculating functional obsolescence due to excess operating expenses and excess inventory costs for Plant 2, with respect to whether these penalties are calculated over the remaining useful life of the subject improvement.

█ The State Board counters Inland's argument by pointing to the "great deference" afforded it as Indiana's property tax expert and by quoting Finding # 158, which declared the State Board's limited six-year period for determining excess operating expenses to be "consistent with true tax value's status as a value in use assessment system." (Resp't Br. at 4.) Finding # 158 reasons that a "taxpayer should be entitled to obsolescence in the

amount that its use value of the property is impaired between assessment dates" and that Plant 2's "market value ... at some point beyond the next assessment date has no bearing on the true tax value of the property today." However, even as Indiana's acknowledged expert on property taxation, the State Board must support its conclusions with substantial evidence and may not abuse its discretion in making its decisions. The self-serving statements in Finding # 158 offer no substantive or authoritative basis for the conclusions reached therein. They are conclusory and are based upon neither an identified source in the State Board's regulations and published instructions nor a generally accepted appraisal principle. Likewise, Finding # 161, which limits the period for determining excess inventory costs from ten to two years, is baseless and therefore conclusory. These findings do not qualify as substantial evidence supporting the State Board's final determination on this sub-issue. Because Inland has made a prima facie case that its methodology for quantifying excess operating expenses and excess inventory costs is correct, these excess costs must be calculated based upon the remaining useful life of Plant 2. While the State Board does have discretion in choosing among valid assessment methods, it has abused its discretion in the present case by imposing invalid limitations for quantifying excess operating expenses and excess inventory costs.

At trial, Mr. Hackett testified that excess capital costs are not calculated over the remaining useful life of the subject facility. Instead, according to Mr. Hackett, they are calculated based upon the net value that can be realized for the asset as of the date of assessment. (Trial Tr. at 158.) The Hackett Study calculated the value of redundant mobile equipment and cranes, determining the penalties based upon "what the depreciated excess equipment would yield if sold in an arm's-length

transaction at depreciated value." (Hackett Study at 14 n. 1.) Inland does not explain why this is the appropriate method. In Finding # 161, the State Board determines functional obsolescence due to excess "equipment investments" by calculating the redundant equipment's carrying costs over a two-year period. Even assuming that the useful life of Plant 2 is applied in determining excess capital costs (or, specifically in this case, the carrying costs of redundant equipment), use of a two-year period is an invalid limitation representing an abuse of the State Board's discretion.

The State Board's final determinations in Findings # 158 & 161, regarding quantification of the Penalties over Plant 2's remaining useful life, is REVERSED and REMANDED. Upon remand, the State Board is instructed to calculate Inland's functional obsolescence due to excess operating expenses and inventory costs according to the remaining useful life of Plant 2.[19] Further, the State Board is instructed to recalculate Plant 2's excess capital costs, after first deciding whether such excess capital costs are determined over the plant's remaining useful life or whether these excess costs are determined as a net value for the equipment as of the date of assessment.

### 2. Inflation Adjustment

Inland alleges that the State Board erroneously assumed and applied a three percent annual inflation rate in converting the Penalties from 1993 dollars to 1985 dollars. According to Inland, the appropriate discount factor for this conversion is the Producer Price Index (PPI). The State Board counters by arguing that Inland has waived this issue on appeal by not objecting to use of the three percent figure at the administrative level. Further, the State Board contends that, notwithstanding Inland's waiver, the record of evidence supports use of a three percent inflation

---

**19.** The Court makes no judgment as to Plant 2's remaining useful life. Inland will be permitted to submit evidence on this point at the remand hearing.

rate because Inland itself applied this rate in the Hackett Study.

Inland agrees that, for purposes of this appeal, the Penalties must be discounted because the cost tables used by the State Board to assess Plant 2 are based on 1985 costs. (Pet'r Br. at 21–22.) In Finding # 162, the State Board reduced the total of Inland's penalties using a "True Tax Value Deflator," which it determined in part by "compounding a 3% inflation rate between 1985 and 1993 over 8 years." However, the State Board's findings provide no basis for applying a three percent inflation rate.

■■■ Inland did not waive this sub-issue. "The general rule in original tax appeals is that the Court is bound by the evidence and issues raised at the administrative level. Therefore, where a taxpayer fails to raise an issue at the administrative level, the issue is waived and may not be considered by the Court." *Hoogenboom–Nofziger v. State Bd. of Tax Comm'rs,* 715 N.E.2d 1018, 1022 (Ind.Tax Ct.1999) (citing *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.,* 420 N.E.2d 1324, 1328 (Ind.Ct. App.1981)). The State Board claims that a "complete review of the transcripts of the hearings held on August 26, 1997 and November 4, 1997 shows that Inland did not challenge the use of the inflation rate at the administrative hearings." (Resp't Br. at 5.) However, at the administrative hearing held on June 19, 1996, Mr. Hackett testified before the State Board that a deflator based upon the PPI should be applied to convert the Penalties from 1993 to 1985 dollars.[20] (Ex. G–3 at 544–46.)

■■■ However, Mr. Hackett did not explain what the PPI represented, how it is calculated or why it is the appropriate factor to determine the deflator.[21] In short, Mr. Hackett's testimony does not prove that use of the PPI in this situation is a generally accepted appraisal technique. Even though Mr. Hackett is a

recognized appraisal expert, his testimony, without explanation, is conclusory and therefore lacks probative value as to quantification of the Penalties. *See Wirth v. State Bd. of Tax Comm'rs,* 613 N.E.2d 874, 878 (Ind.Tax Ct.1993) (finding expert's opinion as to application of negative influence factor, without additional evidence, to be insufficient to overcome State Board's discretion).

This lack of probative evidence does not end the Court's inquiry. The administrative hearings in this case took place before the Court's decision in *Clark v. State Board of Tax Commissioners,* 694 N.E.2d 1230 (Ind.Tax Ct.1998). In *Clark,* this Court announced a prospective rule that requires taxpayers to quantify obsolescence at the administrative level with generally accepted appraisal techniques. *See Clark,* 694 N.E.2d at 1241–42. Although Inland failed to sufficiently support its quantification on this sub-issue, it was not required to do so before the Court's opinion in *Clark.*

To avoid remand, the State Board must show that its use of the three percent inflation rate is supported by substantial evidence. The State Board maintains that evidence of record, i.e., the Hackett Study, supports use of the three percent inflation rate. Specifically, the State Board asserts that the calculations for both real and personal property in Exhibit F of the Hackett Study, titled "Excess Manufacturing Costs Plate Operations" result in a three percent increase for each subsequent year. The State Board opines that this "illustrates that although the Final Determination does not explain the source of the inflation rate, the evidence in the record supports the 3% inflation rate." (Resp't Br. at 6.)

As Inland explains, the State Board is "grasping at straws" with this argument. (Pet'r Reply Br. at 7.) The Hackett

---

**20.** Mr. Hackett found the appropriate deflator to be .83333. (Ex. G–3 at 545.)

**21.** BLACK'S LAW DICTIONARY 1225 (7th. ed.1999) defines "producer price index" as an index of wholesale price changes, issued monthly by the United States Bureau of Labor Statistics.

Study used an assumed three percent annual inflation rate between 1993 and 1995 in calculating the present value of excess operating expenses for Inland's plate operations; this three-year period represents the remaining useful life of the plate operations. *See supra* n. 18. The State Board fails to explain how the use of a projected three percent inflation rate by Mr. Hackett in calculating excess operating expenses necessitates use of the same inflation rate percentage in converting the Penalties from 1993 to 1985 dollars.

The State Board's use of the three percent inflation rate in Finding # 162 is not supported by substantial evidence and must therefore be REVERSED. This sub-issue is REMANDED to the State Board.

### 3. Fifteen Percent Reduction

Inland next challenges the State Board's reduction by fifteen percent of its Penalties in Finding # 162, after they were converted to 1985 dollars. Inland contends that the State Board's assessment regulations do not support use of this fifteen percent discounting factor. Further, Inland claims that no evidence shows that the State Board has ever made such a fifteen percent reduction for any other taxpayer in calculating functional obsolescence.

The State Board counters that the cost tables used to determine Inland's 1993 assessment were based on 1985 costs, less fifteen percent. The State Board states that this fact is a "matter of public record" and relies upon this Court's decision in *St. John III*, 690 N.E.2d at 373 n. 5, as proof. *See supra* note 9. In footnote five of the *St. John III* opinion, the Court observed in dicta that the "cost schedules effective for the 1989 general reassessment reflect 1985 reproduction costs ... that were then reduced across the board by 15%." To support its position, the State Board also relies upon the testimony of its witness, Mr. Joseph E. Beres, a property tax consultant who indicated during an administrative hearing held on August 28, 1997 that the 1989 Manual's costs were based upon 1985 costs reduced by fifteen percent. (Ex. U at 589–90, 652–53, 656–61.)

On this sub-issue, Inland's basic argument is that Finding # 162, in applying a fifteen percent reduction to the Penalties, is not supported by substantial evidence. "The State Board's determination is supported with substantial evidence if a reasonable person could view the record in its entirety and find enough relevant evidence to support the State Board's determination." *Amax Inc. Through Amax Coal Co. v. State Bd. of Tax Comm'rs*, 552 N.E.2d 850, 852 (Ind.Tax Ct.1990). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *South Shore Marina, Inc. v. State Bd. of Tax Comm'rs*, 527 N.E.2d 738, 742 (Ind.Tax Ct.1988)). The Court, in reviewing the State Board's final determination, does not weigh the evidence or judge witness credibility. *Freudenberg–NOK*, 715 N.E.2d at 1030.

Finding # 162 on its face is a conclusory statement. It cites to no source supporting its contention that the costs used to value Plant 2 were based upon 1985 costs less fifteen percent. This is troubling, because the Court "cannot properly review a determination unless it is apprised of the basis for the determination." *Bailey Seed Farms, Inc. v. State Bd. of Tax Comm'rs*, 542 N.E.2d 1389, 1392 (Ind.Tax Ct.1989). In *Bailey Seed Farms, Inc. v. State Board of Tax Commissioners*, the Court held that the State Board's final determination, finding the taxpayer-seed company liable for property tax on inventory in its possession on the date of assessment, was not supported by substantial evidence. *Id.* The assessment was made after the State Board considered and accepted the claim of a second seed company that it did not own the seeds in question. The State Board relied upon

the hearing officer's recommendation in making its determination; however, the record was silent as to the basis for this recommendation. Upon remanding the case to the State Board, the Court observed that the State Board "failed to submit any evidence to the court establishing a reasonable basis for its subsequent assessment against [the taxpayer-seed company]." *Id.*

A review of the administrative record in the present case supports the State Board's finding as regards the fifteen percent adjustment. Mr. Beres testified on both direct and cross-examination that the costs used for assessments in the 1989 Manual reflected 1985 costs that had been deflated by fifteen percent. Mr. Beres indicated that he had been president of a company with which the State had contracted to update the Manual's cost tables for the 1989 general reassessment. (Ex. U at 581.) The 1989 tables were based upon 1985 costs. (Ex. U at 581.) Mr. Beres stated that his company developed costs for the 1989 Manual and that the State, without explanation, had reduced these costs by fifteen percent. (Ex. U at 657–58.) Unlike the facts in *Bailey Seed Farms*, where the State Board provided no evidentiary foundation whatsoever for its final determination, the State

Board in the present case does cite to testimony in the record supporting its position. While Mr. Beres' testimony does not explain why the State Board made this adjustment, it is relevant to the issue of whether the adjustment was made. Further, it was reasonable for the State Board to rely upon the testimony of Mr. Beres, who had first-hand knowledge of the development of the cost tables. His testimony thus qualifies as substantial evidence that the fifteen percent adjustment was made.[22] The Court cannot and will not reweigh that testimony or judge the witness's credibility.[23] Therefore, Finding # 162 is AFFIRMED, with regard to use of the fifteen percent adjustment.

## II. MODEL

As its second major issue, Inland contends that the base reproduction costs for the Major Buildings, *see supra* note 1, should have been determined by application of the GCI Heavy Manufacturing model, not the Mill Manufacturing model.[24] Inland describes the Major Buildings as "basic steel-framed, metal sided buildings.... [They] are large, generally rectangular, simply designed buildings. Most of them consist of a series of side by side bays, each bay typically of uniform height and width, in which any type of industrial

---

**22.** Because Mr. Beres' testimony was, standing alone, sufficient to support the State Board's position on this sub-issue, the Court does not consider Inland's argument that the Court may not take judicial notice of footnote five in *St. John III* because the "fact" of the fifteen percent adjustment is neither "generally known" in Indiana nor "capable of accurate and ready determination" as required by IND.EVIDENCE RULE 201(a). Thus, the Court makes no determination as to whether the fifteen percent adjustment is, as the State Board claims, a "matter of public record."

**23.** The State Board should have explained the basis for the fifteen percent adjustment in its final determination. This Court has previously explained, "Ideally, the State Board would articulate its reasoning in its final determination. That would provide the taxpayer and this Court with detailed written findings that explained how the State Board arrived at its

decision." *Loveless Constr. Co. v. State Bd. of Tax Comm'rs*, 695 N.E.2d 1045, 1049 n. 5 (Ind.Tax Ct.1998), *review denied.* It would behoove the State Board in issuing future findings to specifically reference the evidence supporting its quantification methodology. Of course, in similar fashion, a taxpayer has an "obvious responsibility to appear before the State Board and present evidence and argument in support of its position." *North Park Cinemas v. State Bd. of Tax Comm'rs*, 689 N.E.2d 765, 769 (Ind.Tax Ct.1997). Also, taxpayers are reminded that, in post-*Clark* cases, they "will not be able to rely on the inadequacies of the present method for quantifying obsolescence to get a second bite at the apple." *Clark*, 694 N.E.2d at 1242.

**24.** Inland agrees that the Mill Manufacturing model is the appropriate model for determining the base reproduction costs of the BOF Buildings. (Pet'r Br. at 28.)

operation could be carried out." (Pet'r Br. at 42.) In Finding # 27, the State Board concluded that all the Major Buildings are more properly classified as Mill Manufacturing. In so doing, the State Board noted that, consistent with this model, "Many of the buildings in Plant [2] are characterized by excessive floor and column tolerances, pre-engineered sheet metal walls with 20' wall height and limited openings." (Finding # 27.)

 Under Indiana's property tax assessment system, assessors use cost schedules to determine the base reproduction cost of a particular improvement. *See Whitley Prods.*, 704 N.E.2d at 1116. Schedule A of the State Board's regulations includes cost schedules listing the base prices for different commercial and industrial improvements. *See* IND.ADMIN.CODE tit. 50, r. 2.1–4–5 (1992) (codified in present form at *id.*, r. 2.2–11–6 (1996)). As the State Board's regulations state:

> [Schedule A] consists of base square foot unit rates by floor for various "use" and "finish" types for two types of exterior walls. The rates have been developed for a range of perimeter-to-area ratios for a specified type of construction and adjustments are provided to account for variations in wall heights and structural framing.

IND.ADMIN.CODE tit. 50, r. 2.1–4–3. To help identify and define various classes of buildings, the State Board has categorized improvements into several models.[25] IND.ADMIN.CODE tit. 50, r. 2.1–4–7 (1992) (codified in present form at *id.*, r. 2.2–11–1 to 3 (1996)); *see also Herb v. State Bd. of Tax Comm'rs*, 656 N.E.2d 890, 893 (Ind.Tax Ct.1995).

 A taxpayer, including Inland in the present case, is entitled to have its property assessed using the correct cost schedule. *Indianapolis Racquet Club v. State Bd. of Tax Comm'rs*, 722 N.E.2d 926, 937 (Ind.Tax Ct.2000) (citing *Zakutansky v. State Bd. of Tax Comm'rs*, 696 N.E.2d 494, 497 (Ind.Tax Ct.1998)), *review granted on other grounds*. The State Board may adjust the base reproduction cost for quality (i.e., adjust for grade) only after first using the correct cost schedule. *Zakutansky*, 696 N.E.2d at 497. The "model that most closely resembles the subject improvement with respect to physical features is to be used." *Indianapolis Racquet Club*, 722 N.E.2d at 938 (quoting *Herb*, 656 N.E.2d at 893). As this Court has previously noted, a "classification for taxation purposes is not invalid when it rests on a reasonable basis of actual difference between those [items] included and those excluded." *Id.*, 722 N.E.2d at 937 (quoting *Herb*, 656 N.E.2d at 894). Moreover, "because a building may not conform perfectly with the model specifications, a hearing officer must use subjective judgment to decide which model the building most closely resembles." *Id.* (quoting *Herb*, 656 N.E.2d at 894). Thus, the State Board and its hearing officers have some discretion in selecting which model to use. *Id.*

 To demonstrate that the State Board abused its discretion in selecting the Mill Manufacturing model, Inland must submit probative evidence to establish a prima facie case that another model was more appropriate. *See id.* at 939 (noting that taxpayer "had an affirmative duty to present evidence showing that the State

**25.** The current regulations describe a model as a "conceptual tool used to replicate reproduction cost of a given structure using typical construction materials. The model assumes that there are certain elements of construction for a given use type." IND.ADMIN.CODE tit. 50, r. 2.2–10–6.1 (1996). The State Board's regulations further divide models, as regards commercial and industrial improvements, into one of three use-association groupings:

(1) General Commercial Mercantile (GCM); (2) General Commercial Industrial (GCI); and (3) General Commercial Residential (GCR). *See* IND.ADMIN.CODE tit. 50, r. 2.1–4–3 (1992). Current regulations add a fourth grouping, General Commercial Kit (GCK). *See* IND.ADMIN.CODE tit. 50, r. 2.2–10–6.1 (1996). This original tax appeal involves only two models from the GCI group.

Board abused its discretion"). In *Indianapolis Racquet Club v. State Board of Tax Commissioners*, the taxpayer claimed that the State Board improperly determined the base rate for ninety percent of its tennis facility by applying the rates for the GCM Health Club model, rather than the GCI Light Warehouse model. The taxpayer identified eight features found in the Health Club model that the property in dispute lacked. Also, the taxpayer identified three features in the Light Warehouse model that the area in question possessed. The taxpayer did acknowledge that the tennis facility did not possess all the features of the Light Warehouse model, specifically with respect to lighting, heating and the presence of a hot water boiler. The Court noted that the ninety percent of the tennis facility in dispute "lacked a substantial number of features described in the health club model...." *Indianapolis Racquet Club*, 722 N.E.2d at 939. The Court also observed that the tennis facility's interior matched the description "Unfinished," as found in the Light Warehouse model, better than the description Finished Open, as used in the Health Club model.[26] *Id.* Finally, the Court noted that the hearing officer primarily supported his selection of the Health Club model by referring to the Indiana Assessment Manual's instructions to apply that model to "tennis barns." *Id.* (citing IND.ADMIN.CODE tit. 50, r. 2.1–4–4 (1992) (codified in present form at *id.*, r. 2.2–11–5.1 (1996))). The Court found that the taxpayer had carried its burden to show that the State Board abused its discretion by applying the incorrect model in assessing the ninety percent of the tennis facility at issue; the Court reasoned that

"Considered in its entirety, the evidence shows that the tennis facility's features clearly better match those of the light warehouse model than those of the health club model." [27] *Id.*

Inland supports its position that the GCI Heavy Manufacturing model should be applied with several assertions. First, Inland claims that the vertical column tolerance of the BOF Buildings far exceeds that of the Major Buildings. Inland supports this claim by citing the testimony of Kerry Spitznagle, a certified engineer whom the State Board recognized as having "significant experience in steel mill construction projects...." (Finding # 32.) The State Board also observed that Mr. Spitznagle's conclusions were, for the most part, "persuasive." (Finding # 33.) Mr. Spitznagle stated that the size of the columns in the BOF Buildings is two to four times larger than the columns in the Major Buildings. (Ex. BB at 118–19.) This difference is important, Inland explains, in that the Mill Manufacturing model is characterized by "excessive vertical column tolerance," whereas the Heavy Manufacturing model has only "heavy vertical column tolerance." (Pet'r Br. at 43.) Second, Inland points out that the per square foot costs and the foundation costs for the BOF Buildings are greater than those for the Major Buildings. (Pet'r Br. at 43.) Third, Inland indicates that even though the exterior walls of the Major Buildings are largely constructed of pre-engineered sheet metal (which is consistent with the Type 1 wall structure in the Mill Manufacturing model), "the construction cost of such metal walls is actually less than the construc-

---

26. As the Court explained, the models are subdivided into one of four descriptive classifications "denoting the extent to which interior finish is included in the base cost"; these four classifications are: (1) Unfinished; (2) Semi–Finished; (3) Finished Open; and (4) Finish Divided. *Indianapolis Racquet Club*, 722 N.E.2d at 936 (quoting IND.ADMIN.CODE tit. 50, r. 2.1–4–3 (1992)).

27. The Court in *Indianapolis Racquet Club* agreed that the taxpayer demonstrated that the Light Warehouse model was better than the Health Club model for purposes of assessing the ninety percent of the tennis facility in dispute. *See Indianapolis Racquet Club*, 722 N.E.2d at 941 n. 21. However, upon remand, the Court indicated that the State Board could consider "whether a different model even more closely resembles the tennis facility's physical structure." *Id.*

tion cost of the reinforced concrete block exterior walls (also 'Type 1' walls) that characterize the Regulation 17 Heavy Manufacturing use type model." (Pet'r Br. at 44.) Fourth, Inland claims that the floor loads of the Major Buildings were not "excessive" (per the Mill Manufacturing model); instead, they at most can be deemed to have only "heavy floor load capacity" (per the Heavy Manufacturing model). (Pet'r Reply Br. at 14–15.)

Inland has not established a prima facie case that the Heavy Manufacturing model is the more appropriate model to use in determining the base reproduction costs for the Major Buildings. Inland's evidence was not probative as to what model should be used. Mr. Spitznagle's testimony does show that the BOF Buildings have a *greater* vertical column tolerance than the Major Buildings; however, it is plausible that both the BOF and Major Buildings have *excessive* vertical column tolerances. Inland offers no evidence showing the differences between excessive and heavy vertical column tolerances. Without evidence indicating otherwise, the Court will not assume in this case that two different sized columns cannot both be deemed to have excessive vertical column tolerances. Furthermore, the comparative square foot costs, including foundation costs, of the BOF and Major Buildings does not assist the Court in determining whether the physical features of the Major Buildings best match those of the Mill Manufacturing or Heavy Manufacturing models. The actual square foot cost of a particular building says nothing about the features of that building, for purposes of selecting an appropriate model from the regulations. Inland's third argument actually supports the State Board's selection of the Mill Manufacturing model. The Mill Manufacturing model includes Type 1 walls made up of "Pre-engineered corrugates, metal panels with insulation and exterior paint for a wall height of 20′." [28] IND.ADMIN.CODE tit. 50, r. 2.1–4–7. Inland admits that the Major Buildings have exterior walls constructed mostly of pre-engineered sheet metal.[29] It does not matter whether the sheet metal walls are more costly than concrete brick wall; the assess-

**28.** The model indicates that these walls are "Typical of steel or large mill operations." IND.ADMIN.CODE tit. 50, r. 2.1–4–7 (1992). Even if true, the Court notes that this is only a guide; as stated *supra*, it is the model that most closely resembles the subject improvement with respect to physical features that must be used, regardless of the model's name. *See Herb*, 656 N.E.2d at 893 (observing that actual use of property is only "starting point" in determining proper model). *Cf. Indianapolis Racquet Club*, 722 N.E.2d at 939 (holding that Health Club model was not appropriate model for tennis facility, even though Indiana Assessment Manual instructed that the Health Club model was the "proper schedule" for calculating replacement cost for a "tennis barn").

**29.** In both its post-trial and reply briefs, Inland contends that the Major Buildings lack insulation, a characteristic found in the Mill Manufacturing model but not in the Heavy Manufacturing model. (Pet'r Br. at 44; Reply Br. at 14.) However, Inland fails to reference testimony or evidence supporting this alleged fact. Mr. Spitznagle did testify that the No. 2 BOF Building lacked insulation, but this does not indicate whether the Major Buildings likewise lacked insulation. (Ex. BB at 110.) Even if true, lack of insulation alone does not mean that the Mill Manufacturing model is inappropriate, if other characteristics of the subject improvements resemble the selected model.

Also, the Mill Manufacturing model is characterized by "1% 1¾ [inch] hollow metal service doors [and] 20% Vented steel sash glass windows." IND.ADMIN.CODE tit. 50, r. 2.1–4–7. In Finding # 27, the State Board concluded that many of the buildings in Plant 2 have "limited openings." Inland argues that "The State Board made no reference anywhere in the record to the number or nature of openings, or how the openings conform with any particular Regulation 17 use type model." (Pet'r Br. at 44.) Be that as it may, Inland likewise offers no such evidence or explanation as to openings in Plant 2. This statement, however accurate, is not probative as to the nature of the openings in Plant 2's Major Buildings. *Cf. CDI*, 725 N.E.2d at 1022 n. 8 (noting that Counsel's questions to hearing officer as to his general methodology and instructions for applying bulletin and regulations is not probative evidence on the issue presented).

ing official's concern is to select the model that the subject improvements most closely *resemble*. Relative costs of construction materials are irrelevant in deciding whether the Major Buildings better resemble the characteristics attributed to the Mill Manufacturing or Heavy Manufacturing models.[30] In addition, Inland offers no proof as to the floor load capacities of the Major Buildings; it only contends that the floors have no greater load capacities than the BOF Buildings, which Inland alleges have floors with only heavy load capacities. Without evidence as to the actual construction of the floors in the Major Buildings, Inland cannot establish whether the buildings' floors have either heavy or excessive load capacities. Moreover, even if their construction were similar to or of less quality than the floors in the BOF Buildings, Inland does not sufficiently explain how or why the BOF Buildings' floors have only heavy floor load capacities.[31]

The present case is distinguishable from *Indianapolis Racquet Club,* where the taxpayer established a prima facie case that the State Board abused its discretion in choosing the incorrect model by pointing to several identifiable, objective deviations of the subject improvement from the model chosen by the State Board. The Court reasoned in *Indianapolis Racquet Club* that, when considered in its entirety, the

evidence demonstrated that at least one model better resembled the features of the subject facility. Here, as explained *supra,* Inland's evidence was insufficient to establish that the Heavy Manufacturing model or any other model was the better model for assessing the Major Buildings. The Court finds that the State Board did not abuse its discretion by applying the Mill Manufacturing model to the Major Buildings. Therefore, the State Board's final determination on this issue is AFFIRMED.

### III. GRADE

For its third major issue, Inland claims that the State Board improperly applied a B grade to its Basic Oxygen Furnace (BOF) Buildings[32] and a C + 1 grade to the Major Buildings. Inland argues that the BOF Buildings should not be assigned a composite grade factor higher than C + 2 and that a C grade is appropriate for all the Major Buildings. The Court will briefly review the basics of grade calculation and then separately address the grade issue for the BOF and Major Buildings.

■ Assessors assign each improvement a grade based upon its materials, design and workmanship; the grade represents a multiplier (i.e., a factor) that is applied to the improvement's base reproduction cost. *See* IND.ADMIN.CODE tit. 50, r.

---

**30.** Inland admits that the wall heights of the Major Buildings exceed twenty feet, the designated height in the Mill Manufacturing model. (Pet'r Br. at 44.) The designated wall height in the Heavy Manufacturing model is fourteen feet. IND.ADMIN.CODE tit. 50, r. 2.1–4–7 (1992). Neither model exactly matches the wall heights for the subject improvements. It is evident, though, that the walls of the Major Buildings resemble more closely, in material and height, the description found in the Mill Manufacturing model than the description provided in the Heavy Manufacturing model.

**31.** Mr. Spitznagle testified that the average floor thickness of the No. 2 BOF Building is eight inches. (Ex. BB at 109.) Mr. Robert Bond, an attorney representing Inland, supervised the collection of data about Inland's plants for use in creating Inland's proposed assessment of its facility. (Ex. BB at 79.)

Mr. Bond explained that unit-in-place tables list the costs of ground slabs ranging in thickness from four to twelve inches. IND.ADMIN. CODE tit. 50, r. 2.1–4–10 (1992) (unit-in-place tables) (codified in present form at *id.*, r. 2.2–15–1 (1996)). According to Mr. Bond, the No. 2 BOF does not have excessive floor load capacity (per the Mill Manufacturing model) because an eight-inch floor "actually is not an excessive thickness of floor." (Ex. BB at 109.) Inland's evidence only shows that the average floor thickness for the No. 2 BOF falls within the range of thickness provided in the unit-in-place tables. However, it does not prove that an eight-inch floor cannot be considered to have excessive floor load capacity.

**32.** Inland has two BOF Buildings in dispute, the No. 2 and No. 4 BOF Buildings. (Pet'r Br. at 25.)

2.1–4–3 (1992) (codified in present form at *id.*, 2.2–10–3 (1996)); *Whitley Prods.*, 704 N.E.2d at 1116. Five major grade classifications, designated grades A through E, are provided for by the State Board's regulations. Descriptions for the B and C grades are as follows:

GOOD: B GRADE

Architecturally attractive buildings constructed with good quality materials and workmanship throughout. High quality interior finish with abundant built-in features. Custom heating and air conditioning system, and very good lighting and plumbing fixtures.

AVERAGE: C GRADE

Moderately attractive buildings constructed with average quality materials and workmanship throughout and conforming with the base specifications used to develop the pricing schedule. Minimal to moderate architectural treatment. Average quality interior finish with adequate built-in features. Standard grade mechanical features and fixtures.

IND.ADMIN.CODE tit. 50, r. 2.1–4–3. The B grade has a corresponding factor or multiplier of one hundred twenty percent, while the C grade has a corresponding factor of one hundred percent. *Id.* Prices contained in the regulations' cost schedules reflect C grade standards of quality and design. *Id.* Intermediate grade levels between the major classifications may also be assigned an improvement. *Id.* A plus or minus two (+/2) indicates that the grade falls halfway between the assigned grade classification and the grade immediately above or below it. *Id.* A plus or minus one (+/1) indicates that the grade falls slightly above or below

the assigned grade classification or, as the regulations indicate, "at a point approximately 25% of the interval between the assigned grade classification and the grade immediately above or below it." [33] *Id.; see also* IND.ADMIN.CODE tit. 50, r. 2.1–4–5 (1992) (Schedule F) (codified in present form at *id.*, 2.2–11–6 (1996)).

█ Subject improvements often deviate from the model used to assess them. *Clark*, 694 N.E.2d at 1237 n. 9. Deviations often affect the reproduction cost of an improvement. *Whitley Prods.*, 704 N.E.2d at 1117. As this Court noted in *Whitley Products, Inc. v. State Board of Tax Commissioners*:

The preferred method of accounting for this deviation is to use separate schedules that show the costs of certain components and features present in the model. This allows an assessor to adjust the base reproduction cost of the improvement objectively.

The other means of accounting for an improvement's deviation from the model used to develop the cost schedule is via an adjustment to the grade of the improvement. This type of adjustment requires the assessor's subjective judgment. Where possible, this type of adjustment should be avoided. However, because the component (base rate adjustment) schedules are not comprehensive, this type of adjustment may be necessary.

*Id.* (citations omitted); *see also Clark*, 694 N.E.2d at 1236 n. 6 (noting that regulations provide objective methods for accounting for deviations from the models and that these adjustments, not grade ad-

---

**33.** Per the regulations, grades falling below an E are indicated by a minus one through minus four, with each lower grade representing a reduction of the factor by ten percent. IND.ADMIN.CODE tit. 50, r. 2.1–4–3. A grade of E–4 represents a factor of zero percent. *Id.* Grades above an A are indicated by a plus one through plus ten, with each higher grade representing an increase of the factor by twenty percent. *Id.* An A grade has a factor of one hundred sixty percent; thus, an A+10 grade

has a factor of three hundred sixty percent. *Id. But cf. Garcia v. State Bd. of Tax Comm'rs*, 694 N.E.2d 794, 798 (Ind.Tax Ct.1998) (holding State Board's assessment to be arbitrary and capricious where taxpayers' home was given an A+4 grade but regulations provide "absolutely no definitions or guidelines that allow an assessor, this Court, or the taxpayer[s] the ability to differentiate between an 'A+10' or an 'A' grade dwelling").

justments, "should be used where possible").

## A. *BOF Buildings*

The Lake County Board of Review initially assigned a C grade to both the BOF and Major Buildings. (Pet'r Br. at 26.) In its Proposed Final Assessment Determination, issued July 29, 1997, the State Board indicated for the first time that it intended to increase the grade of the BOF Buildings to B+2 and the grade of the Major Buildings to B. (Ex. R at ¶ 19.) The State Board heard rebuttal evidence from Inland concerning the proposed increases in grade at a hearing conducted on November 4, 1997. (Ex. BB at 3.) In its final determination, the State Board applied a B grade to Inland's BOF Buildings. (Finding # 35.)

■■■■ The State Board, upon hearing an appeal initiated by a taxpayer pursuant to IND.CODE ANN. 6–1.1–15–3 (West 1989) (amended 1993 & 1997) (the Form 131 review process), "may assess the property in question, correcting any errors which may have been made." [34] IND.CODE ANN. 6–1.1–15–4(a) (West 1989) (amended 1993, 1995 & 1997). Thus, the State Board may address and correct errors not raised in a taxpayer's petition for review. *Castello v. State Bd. of Tax Comm'rs*, 638 N.E.2d 1362, 1364 (Ind.Tax Ct.1994) (quoting *Wirth*, 613 N.E.2d at 879). However, if the State Board does choose to address issues not raised by the taxpayer, "the taxpayer is constitutionally empowered to respond to the State Board's disposition of those issues." *Id.* (citing *Wirth*, 613

N.E.2d at 879). The taxpayer must be given notice and an opportunity to be heard.[35] *Wirth*, 613 N.E.2d at 879.

■■■ In the present case, Inland did not raise the issue of grade at the administrative level; the State Board reviewed the grade issue and first notified Inland of its intent to increase the grades of the BOF and Major Buildings in its proposed assessment. Inland was then given an opportunity to respond. Because the State Board placed the grading of these buildings at issue, Inland was not obligated to (but nevertheless chose to) respond to the proposed grade adjustment at a subsequent administrative hearing. Under these circumstances, Inland was not required to present probative evidence establishing a prima facie case as to grade, in order to trigger the State Board's duty to support its final determination with substantial evidence. *But cf. supra* note 7 (citing *Whitley Prods.*, 704 N.E.2d at 1119–20). Regardless of the rebuttal evidence and supporting arguments offered by Inland to counter the State Board's proposed grade adjustment, the State Board was required to support its final determination as to grade with substantial evidence. *Clark*, 694 N.E.2d at 1234; *White Swan Realty v. State Bd. of Tax Comm'rs*, 712 N.E.2d 555, 560–62 (Ind.Tax Ct.1999) (holding that State Board's final determination, wherein it sua sponte lowered the negative influence factor applied to taxpayer's property, was unsupported by substantial evidence), *review denied*.

---

**34.** The State Board may only make such corrections if the assessment was valid in the first place. *Scheub v. State Bd.of Tax Comm'rs*, 716 N.E.2d 638, 644 (Ind.Tax Ct.1999) (citing *Joyce Sportswear Co. v. State Bd. of Tax Comm'rs*, 684 N.E.2d 1189, 1191 (Ind.Tax Ct.1997, *appeal dismissed*)). In other words, the "State Board may not cure a failure on the part of lower taxation authorities to comply with the statutory prerequisites to a valid assessment by way of its ability to correct any assessment error in taxpayer-initiated petitions." *Joyce Sportswear*, 684 N.E.2d at 1192. In the present case, the parties do

not challenge the validity of Inland's initial assessment. Thus, the State Board was free to make corrections under section 6–1.1–15–4(a).

**35.** Where taxpayers dispute the accuracy of the State Board's assessment, not just its authority to make the assessment, the "appropriate arena for the Taxpayers' initial rebuttal of the reassessment of their property is at the administrative level." *Castello*, 638 N.E.2d at 1365.

 The State Board made various findings as to the grade of the BOF Buildings. In assigning a B grade, the State Board pointed to the "significant pilings" of the BOF Buildings. (Finding # 28.) In Finding # 57, the State Board commented that the buildings of No. 2 BOF possessed "foundations and supports capable of bearing extreme loads and also are supported on pilings run through the slag to fill to bedrock." In addition, the State Board determined that, like the No. 2 BOF, the No. 4 BOF is supported by "significant pilings." (Finding # 58.) The State Board further found that the No. 2 BOF Building had "engineering costs closer to ten percent of the total cost of the building." [36] (Finding # 33.) According to the State Board, this fact "alone" is sufficient to warrant application of a B grade to the BOF Buildings. (Finding # 33.) The State Board's Finding # 34 states that Inland failed to consider certain adjustments relating to the absence of partitions, heat and wall finish in calculating a recommended grade of C + 2; the State Board contends that the presence of these adjustments suggests that the BOF Buildings should receive a grade closer to B than to C + 2. (Finding # 34.) Finally, in Finding # 35, the State Board reached the following conclusion: "Taking the effect of engineering costs together with adjustments for partitions, heat and flooring, the Board determines that the grade of the BOF [buildings] is between B and B + 1. However, in fairness to Inland, the grade of B has been used."

 The BOF Buildings' pilings do add value to the improvements. Moreover, they are not included as part of the Mill Manufacturing model. Therefore, they must be accounted for either by the preferred method, an objective adjustment using the unit-in-place tables, or by a grade adjustment. *See Whitley Prods.*, 704 N.E.2d at 1117. The State Board's findings, however, do not explain how the "significant" nature of the pilings translates into or equates with a B grade. A piling may indeed be "significant," but such a label does not explain whether the piling itself (or any part of the building) is architecturally attractive, constructed with good quality materials or has good workmanship throughout—some of the designated features of the B grade. Moreover, the State Board does not explain whether the BOF Buildings have other features of a B grade, i.e., a "High quality interior finish with abundant built-in features [or a] Custom heating and air conditioning system [or] very good lighting and plumbing features". IND.ADMIN.CODE tit. 50, r. 2.1–4–3.

The State Board asserts that the foundation and supports for the No. 2 BOF are capable of bearing "extreme loads." (Finding # 57.) This finding is related to Finding # 33, which determined that the engineering cost for the No. 2 BOF Building was above normal. Mr. Spitznagle's testimony reflects his estimate that for buildings such as the No. 2 BOF Building, the average costs for engineering (as a percentage of total costs) would be around ten percent. (Ex. BB at 123–24.) The State Board insists that "grade is a method for adjusting for costs in excess of the model" and that "Architectural costs incurred in constructing a steel mill will raise the cost of the buildings even without improving the building's appearance." (Resp't Br. at 8.) In short, the State Board appears to argue that the increased engineering costs of the BOF Buildings demonstrate the use of higher quality materials, workmanship or designs for these buildings.[37]

---

36. This contrasts with the alleged typical ratio of engineering cost to building cost in a "basic steel mill building," which the State Board found equaled one or two percent. (Finding # 33.)

37. "The State Board concedes that the Inland Steel Mill is not architecturally attractive." (Resp't Br. at 8.) Thus, the buildings' architecture, as it relates to their aesthetic qualities, is not an issue.

The State Board's regulations provide virtually no insight as to the role of engineering costs in assessing improvements.[38] The grade descriptions provided in the State Board's regulations do reference an improvement's architecture with regard to the improvement's style and design (A grade), attractiveness (B grade) or treatment (C and D grades). IND.AD-MIN.CODE tit. 50, r. 2.1–4–3. Thus, as used in the regulations, to the extent that an improvement's engineering costs relate to or describe its architecture (which, in turn, relates to or describes the improvement's quality of materials, workmanship and design), engineering costs can be relevant to a determination of the structure's proper grade.

The Court also notes that presumably engineering costs are factored into the base rate of a given model. If this is so, then perhaps the Mill Manufacturing model, with its references to "excessive floor load capacity" and "excessive vertical column tolerance," incorporates an above normal figure for engineering costs into its base rates. IND.ADMIN.CODE tit. 50, r. 2.1–4–7. The Court does not state this to be true. What the Court does conclude, however, is that if the State Board desired to reference engineering costs as a basis for assigning a B grade to the BOF Buildings, it should have explained how engineering costs either relate to the B grade description and/or relate to the model's base rates. If engineering costs are in fact factored into a model's base rates, the State Board should have separated out the engineering costs for the BOF Buildings that go above those factored into the base rates for the Mill Manufacturing model.

However, the State Board in its final determination fails to explain how the engineering costs of the No. 2 BOF Building relate to its architecture, reflect an increase in the quality of the materials,

workmanship or design of the improvement, or increase the costs of the improvement beyond those costs already incorporated in the model's base rates (which are based upon C grade standards). Moreover, assuming that the No. 2 BOF Building had engineering costs of ten percent of the building's total costs and that such costs do reflect a higher quality structure, the State Board offers no explanation as to how the ten percent figure translates into a B grade, as opposed to a different grade above C. The State Board's decision in Finding #33 that increased engineering costs "alone" are sufficient to raise the grade of the BOF Buildings is conclusory and therefore does not qualify as substantial evidence supporting a B grade.

The State Board also concluded that Inland failed to properly account for certain physical features absent from the No. 2 BOF Building in arguing for a grade of C+2. The State Board found that Inland's requested grade was based upon a determination of the construction cost of No. 2 BOF Building as a whole using the unit-in-place tables. The State Board observed that, in Inland's analysis, "When all of the elements of 2 BOF were added up, the price of the components totaled 112% of the mill manufacturing model" and that, per Mr. Spitznagle's conclusion, the building's grade should be no higher than C+2. (Finding #32.) According to the State Board, Inland, in reconstructing the entire No. 2 BOF using the unit-in-place tables, excluded costs for certain features-partitions, heat and wall finish—that are found in the Mill Manufacturing model. The State Board reasoned that, because the absence of these items reduced the per square foot price of the No. 2 BOF Building by approximately ten percent, the Mill Manufacturing model "should have been adjusted for the absence of these features

---

**38.** Indeed, the State Board's regulations provide little assistance or insight as to any aspect of grade selection. As this Court stated in *Garcia*, 694 N.E.2d at 798, "Although the State Board's regulations offer some guidance

regarding characteristics of the basic grades, those definitions are vague. Words such as 'generous' and 'extensive' provide little in the way of direction with respect to selection of the proper grade."

prior to being used to compare to the model constructed using the unit-in-place tables. This fact also suggests that the grade of these buildings is closer to B than to C + 2." (Finding # 34.) In other words, the State Board posits that with these deviations present, the pilings added almost twenty percent to the value of the BOF Buildings—not just twelve percent.

In disagreeing with Inland's requested grade, the State Board misunderstood and mischaracterized Inland's methodology for determining the BOF Buildings' proper grade. Exhibit 90 illustrates the methodology used by Inland, which proposes a grade no higher than C + 2 for the BOF Buildings based upon a four-step process. (Pet'r Br. at 35.) Exhibit 90 states:

> The following is a methodology for comparing the State Tax Board proposed Regulation 17 reproduction cost using grade factor "B + 2" (140%)[39] to a Regulation 17 reproduction cost determined by: (1) using a grade factor of "C" (100%); and (2) adjusting the "Total Base" (the cost before application of the grade factor) to account for variations between the actual characteristics of the building foundation and the characteristics of the building foundation found in the Regulation 17 model for "Mill Manufacturing ."
>
> STEP 1 Identify Regulation 17 cost from the Unit in Place ("UIP") tables for building characteristics included in the model but not present in the building:
>
> (a) 12″ reinforced concrete perimeter grade walls; and
>
> (b) 12″ × 18″ strip footings.
>
> STEP 2 Identify Regulation 17 cost from the UIP tables for building char-

acteristics not included in the model but present in the building:

> (a) grade beams;
>
> (b) wall footings;
>
> (c) foundation piles;
>
> (d) foundation pile caps; and
>
> (e) foundation piers.
>
> STEP 3 Subtract from the State Tax Board Total Base the total cost from STEP 1, then add the total cost from STEP 2.
>
> STEP 4 Divide the result from STEP 3 by the State Tax Board Total Base and compare this percentage to the 140% grade factor applied by the Board.

Exhibit 92 explains in detail how Inland, using the unit-in-place tables, calculated the cost for each listed item in applying the above steps to reach a base price adjustment of one hundred twelve percent, which rounds downward to one hundred ten percent—the corresponding factor for a C + 2 grade.

The State Board incorrectly asserts that Inland's analysis reconstructs the entire No. 2 BOF Building. Rather, Inland's analysis focuses only on the building's foundation, including the perimeter grade walls, strip footings, grade beams, wall footings, foundation piles, pile caps and piers. (Pet'r Br. at 30 & 31.) According to Inland, its method "isolates the effect of the particular characteristics of the BOF Building foundations and pilings on the grade factor determination." (Pet'r Br. at 31.) Thus, Inland's methodology excludes calculations of the effects of the other identified deviations in the model, i.e. those relating to partitions, heat and wall finish. These adjustments, Inland maintains, were incorporated into the "Total Base" of the

39. Exhibit 90 was drafted in response to the State Board's proposed final assessment determination, which assigned a grade of B + 2 to the BOF Buildings, instead of the B grade (120%) actually assigned by the State Board in its final determination. (Ex. R at ¶¶ 19, 36 & 37.) In addition, the Court notes that Inland's exhibits and testimony refer only to No.

2 BOF. However, Inland asserts that Ex. 90 represents the same methodology used to determine grade for both the No. 2 and No. 4 BOF Buildings. (Pet'r Br. at 30.) Also, Mr. Spitznagle testified that the two structures were similar in costs and that a similar analysis as to foundations would apply. (Ex. BB at 117.)

No. 2 BOF Buildings *before* a grade adjustment for the foundation was determined using its methodology. (Pet'r Br. at 31–32.)

■ However, Inland's method, even considered in its proper light, is not supported by the regulations, which do not articulate a method for using calculations made via the unit-in-place tables to ascertain an improvement's grade. Inland should have subtracted those items in the model but not found in the BOF Buildings from the buildings' base reproduction costs and then added the increased costs of the foundations, ending the calculation at that point. In other words, Inland should have stopped its calculation at STEP 3. As noted *supra*, the preferred method for calculating deviations from the models is to use separate schedules showing the costs of components. *See Whitley Prods.*, 704 N.E.2d at 1117.[40] Inland's evidence does not establish a prima facie case that the BOF Buildings should be assigned a grade no higher than C + 2.

Findings # 32 and # 34 lack any basis in fact. As with Finding # 33, they cannot be considered substantial evidence supporting Inland's grade assignment. Moreover, Findings # 28, 57 & 58 are not supported by substantial evidence. Therefore, the State Board's assignment of a B grade to the BOF Buildings is REVERSED and this sub-issue is REMANDED to the State Board.[41]

### B. *Major Buildings*

■ The State Board assigned the Major Buildings a grade of C + 1. As with the BOF Buildings, the State Board was obligated to support its grade assignment with substantial evidence. In Finding # 28, the State Board observed that a "significant number of [the Major Buildings] exceed the specifications of the mill manufacturing model and therefore are properly graded as C + 1 grade buildings. These buildings include substantial 'clamshell' type monitors not included in the model and have walls and columns that exceed the specifications in the model." In its findings discussing the individual buildings comprising the group of Major Buildings, the State Board did not elaborate as to why a C + 1 grade was generally applied.[42] (Findings # 47–54 & 56.)

■ That the Major Buildings exceed the specifications of the Mill Manufacturing model is a conclusory statement; it thus cannot be considered substantial evidence supporting the C + 1 grading. Likewise, the assertion that the Major Buildings have walls and columns exceeding the model's specifications is conclusory. It

---

**40.** Taking this approach, Inland could then have argued for application of a straight C grade, grounding its argument in the language of the State Board's regulations. However, the Court notes that in Ex. 92, Inland lists various items that have no specific listing in the unit-in-place tables. For these items, Inland could have, as it did, extrapolate approximate values based on the tables or instead argued for a grade adjustment. Where the State Board's regulations or informational bulletins do not provide values or guidance for valuing particular items (i.e., the State Board provides no ascertainable standards for valuing the property), a taxpayer may submit as proof of value any objectively verifiable evidence. *See Sterling Management–Orchard Ridge*, 730 N.E.2d at 838 (permitting submission of objectively verifiable information as to taxpayer's iron fencing, where State Board had provided no values for the fencing).

**41.** In its Brief, the State Board further supports its grade assignment by arguing that Inland's steel mill was built "[l]ike most steel mills, ... with good quality construction." (Resp't Br. at 8.) In addition, the State Board relies upon its witness Mr. Beres, who testified at the administrative level that, "There is nothing average about buildings that house heavy manufacturing and steel processing." (Resp't Br. at 8) (quoting in part Ex. U at 590.) These are also conclusory observations that do not support the assignment of a B grade for the BOF Buildings. *See CDI*, 725 N.E.2d at 1019.

**42.** Some portions of Building Nos.2039, 2043 & 2096–99 (Mile Long Building) were assigned a C grade. (Finding # 50.) Moreover, some parts of Building No.2094 (No. 3 Cold Strip Mill) received a D grade. (Finding # 52.)

does not instruct the Court as to the extent of the alleged deviations or how the deviations justify a C+1 grade. Therefore, this statement too is not substantial evidence. *See CDI*, 725 N.E.2d at 1019.

Finally, as to the presence of "clamshell monitors," the State Board once more does not explain how these items support application of a C+1 grade. Clamshell monitors are not listed in the regulations, and neither party sufficiently instructs the Court as to the design or construction of these features, other than to say they are "substantial."[43] Mr. Spitznagle, Inland's witness, did testify that the monitors are "typically all off-the-shelf items that just get added on ... top of the building." (Ex. BB at 130.) Furthermore, according to Mr. Spitznagle, they are "relatively cheap," representing less than one-half of one percent of the buildings' costs. (Ex. BB at 130–31.)

The presence of the monitors is probative as to grade; if they cannot be accounted for using the unit-in-place tables (and assuming that no deviations otherwise warranting a reduction in base rate are present), then a grade adjustment may be necessary to account for them. However, the evidence of record cannot be deemed substantial. The only real evidence as to the value of the monitors tends to show that they do not add any significant value to the Major Buildings. Thus, the State Board has not supported its grade assignment, as to the Major Buildings, with substantial evidence.

Inland claims that it has demonstrated that a straight C grade is appropriate. Citing Mr. Spitznagle's testimony, Inland maintains that a C grade is warranted for the following reasons: (1) the BOF Buildings were the most expensive structures in the plant; (2) the column shafts for the Cold Mill Buildings and the Hot Strip Buildings were only one-half to one-fourth the size of the BOF Buildings' strip columns; and (3) the vertical column tolerance of the BOF Buildings far exceeds the vertical column tolerance of the Major Buildings. Inland provides no other evidence supporting its position.

Inland did not offer probative evidence showing that the Major Buildings should be assigned a C grade. Inland essentially argues that the "most appropriate" grade factor to apply to the BOF Buildings is C+1 (and not higher than C+2) and that the Major Buildings have lower reproduction costs than the BOF Buildings. (Pet'r Br. at 40.) Accordingly, Inland maintains, the Major Buildings must receive a grade lower than the BOF Buildings and, therefore, the "most appropriate" grade for the Major Buildings is C. (Pet'r Br. at 40) (Ex. BB at 120–21.) Without further explanation, the costs of the Major Buildings vis à vis the BOF Buildings is irrelevant in selecting an appropriate grade. Inland should have referenced and incorporated the regulations in explaining how the relative costs either indicate that the Major Buildings have average quality or lack any deviations from the model that must be accounted for via a grade adjustment.

■■ Inland does point out that the Major Buildings have smaller columns with lower vertical column tolerances than those found in the BOF Buildings. However, differences in the sizes of columns in the buildings do not necessarily prove that these columns are different in quality, for

---

**43.** The current regulations define a "monitor roof" as "a type of gable roof, commonly found on industrial buildings, having a small raised portion along the ridge with openings for the admission of light and air." Ind.Admin.Code tit. 50, r. 2.2–16–2(60) (1996). "Clamshell" refers to an "object or esp[ecially] a piece of equipment or apparatus resembling or having a part that resembles a clam or the valves of a clam (as in mechanical operation.)" Webster's Third New Int'l Dictionary 415 (1981). Thus, the Court assumes that a "clamshell monitor" is a clam-shaped device used to provide light and air within the Major Buildings. Moreover, the State Board does not instruct the Court as to how these monitors are "substantial." "Substantial" can mean "important" or "essential" or, in terms of a structure, "firmly or stoutly constructed." *Id.* at 2280.

purposes of selecting grade. *Compare* Section II, *supra* (observing that different sized columns may both be considered to have excessive vertical column tolerances). Column tolerances in the subject improvement that are different from those listed in the model used to assess the improvement may require adjustments in its grade; however, merely showing that a subject improvement's columns differ in size from those found in another improvement does not prove that the subject improvement should receive a grade adjustment.

The State Board did not support its assigned grade of C+1 with substantial evidence. In addition, Inland did not submit probative evidence demonstrating that a C grade is appropriate. Therefore, the State Board's decision on this sub-issue is REVERSED and REMANDED.

## CONCLUSION

For the aforementioned reasons, the Court REVERSES and REMANDS the State Board's final determinations as to Issues I & III. However, the State Board's decision in Finding # 162 to apply a fifteen percent adjustment in converting 1993 dollars to 1985 dollars is AFFIRMED. Also, the Court AFFIRMS the State Board's final determination as to Issue II.[44] Upon remand, Inland may submit additional probative evidence supporting its positions, and the State Board shall deal with this evidence in a meaningful manner. The State Board is expected to support its new findings with substantial evidence.

APPENDIX

Assumptions:

| | |
|---|---|
| Reproduction Cost | $150 |
| Replacement Cost | $100 |
| Subject Physical Dep. | 40% |

| Traditional Textbook Appraisal Method to Determine Depreciated Cost | | Indiana Regulation 17 Method to Determine Depreciated Costs/ True Tax Value | |
|---|---|---|---|
| Reproduction Cost | $150 | | |
| Replacement Cost | 100 | | |
| Excess Construction Cost | $ 50 | | |
| Reproduction Cost | $150 | Reproduction Cost | $150 |
| Functional Obsolescence-Excess Construction Cost | -50 | Physical Depreciation (40%) | -60 |
| Replacement Cost | $100 | Remainder Value | $ 90 |
| Physical Depreciation (40%) | -40 | Functional Obsolescence- | |
| Depreciated Cost | $ 60 | * Depreciated Excess Construction Cost | -30 |
| | | Depreciated Cost/ True Tax Value | $ 60 |
| Reproduction Cost | $150 | Reproduction Cost | $150 |
| Less Total Depreciation | -90 | Less Total Depreciation | -90 |
| Depreciated Cost | $ 60 | True Tax Value | $ 60 |
| | | Reproduction Cost | $150 |
| | | Less Physical Dep. (40%) | -60 |
| | | Remainder Value | $ 90 |
| | | Less Functional Obsol. | -30 |
| | | True Tax Value | $ 60 |

* $50 × .40= $20; $50 − $20= $30

44. Inland initially raised two additional issues: whether the State Board's final determination violated (1) IND.CODE ANN. § 4–22–2–19.1 (West 1999) and (2) the United States and Indiana Constitutions, *see* U.S. CONST. amend XIV, § 1 (Equal Protection Clause) and IND. CONST. art. I, § 23 (Equal Privileges and Immunities Clause). At the oral argument in this case, Inland agreed to dismiss these two issues. (Oral Argument Tr. at 44.) Therefore, the Court does not consider these issues.

Note: The excess construction cost under the traditional method ($50) is 33 1/3% of the improvement's reproduction costs ($150). Likewise, using the true tax value method, the depreciated excess construction ($30) costs is 33 1/3% of the improvement's remainder value ($90), which is the improvement's reproduction costs minus physical depreciation. (Trial Tr. at 166–67.)